**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION**

U. S. DISTRICT COURT
Southern District of Ga.
Filed In Office
12:26 P M
June 24 20 24
M. Utis
Deputy Clerk

BOKF, N.A.,

     Plaintiff,

vs.

EVANS CARE GROUP, LLC,
and
SUNSHINE RETIREMENT LIVING, LLC,

     Defendants.

Civil Action No.: 1:24-cv-00088-JRH-BKE

---

**AGREED ORDER (A) APPOINTING RECEIVER, (B) GRANTING
CERTAIN INJUNCTIVE RELIEF AND (C)APPROVING RECEIVER FINANCING**

This cause came to be heard upon the *Motion of BOKF, N.A. (the "Plaintiff" or "Lender")
for the Entry of an Order: (i) Appointing an Interim Receiver, (ii) Granting Certain Injunctive
Relief, and (iii) Approving Receiver Financing* and the *Memorandum of Law in Support thereof*
(collectively, the "Motion").

The Court, having considered the Motion, the Complaint, all documents attached to the
foregoing, all other documents and submissions in support of the Motion, and any opposition
thereto.  Cause exists for the appointment of a receiver pursuant to the terms of the financing
contracts between the parties and applicable law.  The Court finds that there is no just reason for
delay as to the Motion and finds it to be well taken and, therefore, grants the same.  The Court
further finds, for purposes of this motion only and without prejudice to the Defendants' rights to
dispute these findings in this or other proceedings, that:

1

A.      Lender made a loan in the original principal amount of $27,500,000.00 jointly and severally to four Borrowers under common ownership pursuant to that certain Loan Agreement dated as of October 31, 2019 (the "Original Loan Agreement"), by and among Lender, Evans Care Group, LLC ("Evans"), Gahanna Care Group, LLC ("Gahanna"), Mason Care Group, LLC ("Mason"), and Mishawaka Care Group, LLC ("Mishawaka").

B.      The proceeds of the Loan under the Original Loan Agreement were used to refinance mortgage debt for four healthcare facilities: Marshall Pines Alzheimer's Special Care Center ("Marshall Pines") owned by Evans, Sage Park Alzheimer's Special Care Center ("Sage Park") owned by Gahanna, Central Park Alzheimer's Special Care Center ("Central Park") owned by Mason, and Heritage Pointe Assisted Living & Memory Care ("Heritage Point") owned by Mishawaka.

C.      As more fully described below, after a series of defaults, forbearance agreements and related events, the Sage Park, Central Park and Heritage Point facilities have all been sold, the proceeds of which have gone to pay down some of the debt to Lender, leaving Evans as the sole Borrower and Marshall Pines as the sole facility collateral securing the obligations under the Loan Documents (as that Term is defined below).

D.      As of May 31, 2023, the principal debt remaining under the Loan Documents is $15,386,636.65

E.      A true and correct copy of the Original Loan Agreement is attached to the Motion as **Exhibit "A"** and incorporated herein by reference.

F.      A true and correct copy of the Promissory Note dated October 31, 2019, and executed by Evans and the other Borrowers (the "Original Note") is attached to the Motion as **Exhibit "B"** and incorporated herein by reference.

2

G.    A true and correct copy of the Deed to Secure Debt and Security Agreement, dated October 31, 2019 (the "Marshall Pines Mortgage") recorded November 1, 2019 in Columbia County, Georgia in Book 12232 at pages 0225 through 0258, and granting Lender a lien in and upon all real and personal property assets owned by Evans, including Marshall Pines, is attached to the Motion as **Exhibit "C"** and incorporated herein by reference.

H.    Sunshine Retirement Living, LLC ("SRL") is the manager of the Marshall Pines Facility. A true and correct copy of the Management Subordination Agreement dated October 31, 2019 (the "Marshall Pines Management Subordination Agreement"), whereby SRL subordinated any interests under its Management and Consulting Services Agreement with Evans to the rights, liens and security interests of Lender, and undertook certain other obligations to Lender, is attached to the Motion as **Exhibit "D"** and incorporated herein by reference. The Original Loan Agreement, the Original Note, the Marshall Pines Mortgage and the Marshall Pines Management Subordination Agreement are referred to herein as the "Original Loan Documents."

I.    Under the terms of the Original Loan Documents and other related documents, the original four borrowers, Evans, Gahanna, Mason and Mishawka, were jointly and severally indebted to Lender.

J.    Under the terms of the Original Loan Documents and other related documents, the Marshall Pines Mortgage granted a lien and security interests in the Marshall Pines Facility in favor of Lender to secure all obligations under the Original Promissory Note.

K.    Under the terms of the Original Loan Documents, the proceeds of the loan were used to, among other things, refinance the existing debt and payoff and obtain a release of a previous lien upon the Marshall Pines Facility.

3

L.      Effective as of July 31, 2020, Evans, together with the other borrowers, entered into a Forbearance Agreement (the "<u>First Forbearance Agreement</u>"), which, among other things, acknowledged that the borrowers had failed to achieve the required Debt Service Coverage ratio as set forth in Section 6.2 of the original Loan Agreement for the quarters ending March 31, 2020 and June 30, 2020.

M.      Effective as of May 16, 2022, Evans, together with the other borrowers, entered into a Forbearance Agreement (the "<u>Second Forbearance Agreement</u>"), which, among other things, acknowledged that the borrowers had (i) continuously failed to comply with the financial covenants set forth in Sections 6.1 and 6.2 of the original Loan Agreement, and (ii) failed to pay principal and interest due as of July 1, 2022.

N.      Effective as of October 31, 2022, Evans, together with the other borrowers, entered into a Forbearance Agreement (the "<u>Third Forbearance Agreement</u>"), which, among other things, acknowledged that the borrowers had (i) continuously failed to comply with the financial covenants set forth in Sections 6.1 and 6.2 of the original Loan Agreement, and (ii) failed to pay, at the then maturity date of October 31, 2022, the entire outstanding balance.

O.      Effective as of June 26, 2023, Evans, together with the other borrowers, entered into a Forbearance Agreement (the "<u>Fourth Forbearance Agreement</u>"), which, among other things, acknowledged that (i) the forbearance period under the Third Forbearance Agreement had terminated due to the failure to make a principal and interest payment due thereunder on April 3, 2023, and (ii) all outstanding obligations were due and payable in full.

P.      The Fourth Forbearance Agreement extended the Forbearance Period through December 31, 2023, absent the occurrence of a further Termination Event.

4

Q.     The Original Loan Documents, together with the First, Second, Third and Fourth Forbearance Agreement (and all documents referenced therein) are herein defined as the "Loan Documents."

R.     As of December 31, 2023, Evans and the other borrowers had failed to find refinancing, obtain viable sales of any of the facilities, including Marshall Pines, and were otherwise in default of their obligations under the Loan Documents.

S.     On or about April 19, 2024, Gahanna paid to Lender the sum of $6,500,000.00 to obtain a release from its obligations under the Loan Documents, including a release of liens upon the Sage Park facility (the "Sage Park Release").

T.     Nothing contained in or related to the Sage Park Release released Evans from its obligations under the Loan Documents.

U.     On or about May 6, 2024, Mason and Mishawaka paid to Lender the sum of $4,500,000.00 to obtain a release from its obligations under the Loan Documents, including a release of liens upon the  Central Park and Heritage Point facilities (the "Heritage Point/Central Park Release").

V.     Nothing contained in or related to the Heritage Point/Central Park Release released Evans from its obligations under the Loan Documents.

W.     Neither Evans nor its owners or investors have indicated any ability or willingness to make any similar payment to Lender to obtain such a release.

X.     SRL has stated that it can no longer continue to manage the Marshall Pines Facility as it does not generate sufficient revenues, investors will not support the continued operation financially, and SRL has not been paid management fees under its agreements with Evans.

5

Y.     Evans' obligations under the Loan Documents are secured by the Marshall Pines

Mortgage, which granted the Lender, a first-priority lien upon and security interests in, among

other things, the following (collectively, the "Collateral"), each as defined in the Marshall Pines

Mortgage:

      (a)   the Land;
      (b)   all Improvements;
      (c)   all Fixtures;
      (d)   all Appurtenant Rights;
      (e)   all Equipment;
      (f)   all Accounts;
      (g)   all Deposit Accounts;
      (h)   all Contracts;
      (i)   all General Intangibles;
      (j)   all Permits (to the extent assignable);
      (k)   all Money;
      (l)   all Instruments;
      (m)   all Inventory;
      (n)   all Reimbursement Contracts;
      (o)   all Rents;
      (p)   all Leases:
      (q)   all Personalty;
      (r)   all Chattel Paper;
      (s)   all Supporting Obligations;
      (t)   all Investment Property;
      (u)   all agreements for the sale of the above;
      (v)   all Imposition Deposits;
      (w)   all refunds;
      (x)   all names, trademarks, trade names, goodwill and the like;
      (y)   all rights;
      (z)   all renewals, replacements, and Proceeds of the foregoing.

Z.     The Marshall Pines Mortgage was properly recorded on November 1, 2019 in Book

12232, at pages 0225-0258, with the Clerk of Superior Court of Columbia County, Georgia.

AA.     The total amount due and owing under the Loan Documents through and including

May 31, 2024 is $16,918,571.95, which includes $15,386,636.65 in principal, $1,281,935.30 in

accrued but unpaid interest, and $250,000.00 in fees and other charges.  Interest continues to accrue

per the terms of the Loan Documents.  This amount is past due and immediately payable to the Lender, together with interest and other charges that will accrue after May 31, 2024.

BB.     Generally, Section 8.2 of the Original Loan Agreement entitles the Lender to, among other things, accelerate all payments owed by Evans under the Loan Documents upon an event of default. See Section 8.2(b) of the Original Loan Agreement.  It further entitles the Lender to "protect and enforce its rights by action at law (including, without limitation, bringing suit to reduce any claim to judgement), suit in equity and other appropriate proceedings including, without limitation, for specific performance." See Section 8.2(c) of the Original Loan Agreement.

CC.     Section 15(f) of the Marshall Pines Mortgage states that a receiver shall be appointed "as a matter of strict right, without notice and without regard to the sufficiency or value of any security for the loan, … to take possession of and to operate the Mortgaged Property and to collect and apply any revenue" from the Marshall Pines Facility.

DD.     Section 15(f) of the Marshall Pines Mortgage further states that Evans "will pay unto Lender upon demand all actual expenses, including receiver's fees, actual attorney's fees, costs and agent's compensation, incurred pursuant to the provisions of this Section, and upon any Grantor's failure to pay the same, any such amounts shall be added to the Loan Obligations and shall be secured by this Security Instrument."

EE.     Absent appointment of a receiver, the Lender will continue to go unpaid.  The appointment of a receiver is necessary to preserve, protect, and maintain the value of the Lender's secured interests the Collateral.

FF.     Evans has subjected the Collateral to significant risk of loss by failing to provide insurance in the manner required by the Loan Documents to protect the Lender's interest in and to the Marshall Pines Facility and other Collateral.  These defaults by Evans raise the specter that the

7

Collateral will be further eroded by the necessity for the Lender to expend funds to force place insurance without the benefit of the revenues from the Marshall Pines and the business conducted therein.

GG.    The dire financial condition of Evans, as evidenced by its inability to make principal and interest payments to Lender for more than a year and its inability to provide appropriate insurance, has jeopardized and will jeopardize the Lender's secured position and the benefit that can be derived from the Marshall Pines and other Collateral. Neither Evans nor any of its investors has indicated a willingness or ability to provide additional funding to the Marshall Pines Facility. SRL has stated that it can no longer continue to manage the Marshall Pines Facility as it does not generate sufficient revenues, investors will not support the continued operation financially, and SRL has not been paid management fees under its agreements with Evans.

HH.    Absent appointment of a receiver, the Marshall Pines Facility will continue to decline, eroding the value thereof and ultimately putting residents at risk.

II.    As each day passes, revenues are expended and the Lender is irreparably harmed as those revenues can never be recouped.

NOW, therefore, it is ORDERED, ADJUDGED, and DECREED that the Motion is GRANTED as follows:

1.    Effective upon the entry of this Order, SAK Georgia, LLC (the "Receiver") is appointed receiver for the Property (defined below). The Receiver is a limited liability company that is organized under the laws of the State of Delaware and qualified to do business in the State of Georgia. The Receiver is not a party, person or attorney interested in this action. The Receiver's duty and authority to act as the Receiver is subject to the terms of this Order as it may be amended from time to time.

8

2.      The Receiver is appointed for Evans, the Marshall Pines Facility, the Collateral and any business, properties and assets, real, personal and mixed, of whatever kind and description, and wheresoever situated which are owned by Evans, including all rights of Evans with respect to the control, operation, and management of the Marshall Pines Facility and any information necessary for such control, operation, and management of the Marshall Pines Facility (collectively, the "Property").  The Receiver is appointed to act and serve as receiver with respect to the Property and with respect to the income therefrom, whether now existing or hereafter collected, including the rents, profits and income of any kind from the Property.  The Receiver shall be vested with, and is authorized, directed and empowered to exercise, all of the powers of Evans, and its officers, directors, members or shareholders (as applicable) or persons who exercise similar powers and performs similar duties with respect to the operation of the Property; and Evans and its officers, agents, employees, representatives, directors, successors in interest, attorneys in fact and all other persons acting in concert or participating with them, are hereby divested of, restrained and barred from exercising any powers vested herein in the Receiver with respect to the operation of the Property.

3.      Until further notice of the Court, all persons or entities, including, without limitation, residents and other tenants in possession of the Property or any portion thereof, and any persons liable therefore, shall turnover and pay to the Receiver all rents, income, or other amounts now due and unpaid and all rents, income or other amounts hereafter to become due in connection with the operation of the Property.  The Defendants, both directly and through their respective agents, servants, representatives and attorneys, are hereby enjoined and restrained from collecting any rents, fees or income from, or incident to the Property and from interfering in any manner with the Receiver and the operation of the Marshall Pines Facility.

4.     The Receiver is authorized and empowered, in its discretion and business judgment, to oversee the Property and shall have full power and authority to oversee the management of and conserve the Property, including, without limitation, all licenses used or held by Evans or the Marshall Pines Facility and all provider agreements relating to the Property. The Receiver is authorized to take and have complete possession, management, custody and exclusive control of the Property and is further authorized to take all actions, to have all powers and authority held by receivers as is reasonably necessary and proper to accomplish the purpose herein stated, including but not limited to the authority to:

a.     Reasonably prevent waste, and to preserve, secure, manage, maintain and safeguard the Property and all other forms of property to which the Receiver is entitled to take possession and control under this Order;

b.     Take possession and control of all existing bank accounts of Evans (the "Accounts"), and take possession and control of all cash and funds belonging to or for the benefit of the Marshall Pines Facility, whether in the name of, possession of or control of any of the Defendants or their respective affiliates, management company, agents or employees, including taking such actions outlined in Subparagraph (c) below. The Receiver shall have control of the Accounts. The Accounts shall remain open and shall remain under the name of the existing account holder with such account holder's TIN (FEIN or SSN) associated with the Accounts. All depository banks are expressly prohibited from closing the Accounts. All depository banks are expressly prohibited from requiring the Receiver to open new accounts or put the Accounts under the Receiver's name with the Receiver's TIN (FEIN or SSN);

c.     With respect to the Accounts, take any such actions necessary to control the Accounts, including, without limitation: (i) modify the authorized signors on the Accounts to those persons identified by the Receiver; (ii) delete any signors to the Accounts as requested by the Receiver; (iii) continue to use Evans' TIN (FEIN or SSN) with respect to such Accounts, (iv) in the Receiver's sole discretion, open one or more new bank accounts (under Evans' name and using Evans' TIN (FEIN or SSN)) and/or (v) sweep any funds in the Accounts or accounts maintained by or for the benefit of Evans in connection with the Marshall Pines Facility on a daily basis as directed by the Receiver. None of the Defendants nor their respective agents, representatives or affiliates shall have access to such accounts, cash and funds belonging to or for the benefit of Evans and/or the Marshall Pines

10

Facility and any depository bank, upon instruction from the Receiver, shall not allow any check or other transfer (wire, ACH or otherwise) to clear such bank account to the extent that such check or other transfer (wire, ACH transfer or otherwise) was initiated but not yet cleared as of the date of entry of this Order;

d.      Pursuant to any of the actions taken in Subparagraphs (b) and (c) above, continue to use, with the same account numbers, the Accounts, and deposit funds in and withdraw funds from the Accounts by all usual means, including checks, wire transfers, and other debits;

e.      Administer the Property including securing residents at the Marshall Pines Facility and executing contracts for the Property, including the Marshall Pines Facility, the duration and terms of which are reasonable and customary for the type of use involved;

f.      Retain, employ, or continue, through Evans or others, including through any entity currently employing such persons and consistent with any applicable existing agreements, the employment of all custodians, janitors, maintenance workers, repairmen/contractors, assistants, agents, accountants, medical staff, nurses, certified nurse aides, direct support personnel and other professionals and employees, construction managers, general contractors, subcontractors, architects, engineers, consultants, title companies, environmental consultants, asset managers, attorneys, securities companies, property managers, leasing agents, administrative support (such as management, billing, and collection personnel), reasonably deemed necessary, appropriate, or desirable to assist the Receiver in diligently executing the duties imposed upon the Receiver by this Order including, but not limited to the maintenance of the Property and to compensate or continue the compensation of such persons or entities;

g.      Make such payments and disbursements in the ordinary course of business as may be necessary and proper for the preservation of the Property, including: (i) paying ordinary operating expenses, including utilities, rents, and other expenses of management, including, without limitation, compensation of all persons employed by the Receiver as permitted hereunder; (ii) purchasing all necessary food, beverage, medical, cleaning and other supplies, equipment, furniture and furnishings; and (iii) contracting for all necessary services at the Property;

h.      Maintain appropriate and adequate insurance, continue any current policies in place, and to purchase further insurance as the Receiver deems appropriate, subject to approval by the Plaintiff;

11

i. Insure and reinsure the Receiver, its agents, and/or the Property against all risks incidental to the Receiver's oversight thereof (the Receiver may secure new insurance policies, if necessary, and finance them);

j. Pay all current, past due, and future real estate taxes, property taxes, and any other taxes and assessments against any of the Property, subject to approval by Plaintiff;

k. Make all repairs, declarations, renewals, replacements, alterations, additions, betterments, and improvements in connection with the Property as may seem appropriate to the Receiver, provided that the Receiver shall not make any improvements and/or repairs having a cost of $10,000.00 or more without first obtaining approval from the Plaintiff;

l. Market for rent some or all of the Property;

m. Maintain all permits, licenses, certifications, and other authorizations as required by federal, state and local law; monitor price and cost reimbursement or payment levels in the service area(s) of the Marshall Pines Facility and where appropriate, seek approval of appropriate changes to resident rates or payment schedules applicable to the Marshall Pines Facility;

n. Operate the Marshall Pines Facility under any licenses and certificates issued by the State of Georgia;

o. Conduct a complete and thorough analysis (and reconstruction, if necessary) of Evans' financial statements, records, and other information, and speak with Evans' representatives and managers and any other persons regarding the Property, and its business operations and financial condition;

p. Analyze, and determine the best approach to maximize value from the Property for the benefit of the Plaintiff and Evans' creditors;

q. Share information on the Property, including the Marshall Pines Facility, for the purpose of, and to cooperate with Plaintiff in, locating a third-party to operate the Marshall Pines Facility, which shall be acceptable to Plaintiff in its sole discretion (a "New Operator") and to enter into an operations transfer agreement and any such other necessary agreements, on behalf of Evans, with such New Operator and execute any other agreements, forms, applications or other documents, on behalf of Evans, including, without limitation, any necessary filings with the federal, state or local government authorities and regulators, to facilitate such transfer to a New Operator to insure the uninterrupted care for the residents and the orderly transfer of facility operations to the New Operator, subject to the limitations and requirements of applicable laws and regulations;

12

r.   Ensure that Evans and the Marshall Pines Facility are in compliance with applicable federal and state laws and regulations relating thereto and the Receiver shall be authorized to enter into in the name of or on behalf of Evans and the Marshall Pines Facility, any reimbursement contracts, and any other agreements necessary for the use or operation (including transfer to the New Operator) of the Marshall Pines Facility under the Medicare and Medicaid programs as well as any third-party payor requirements, and seek approval of changes to resident rates or payment schedules. In addition, should the Plaintiff lease or plan to lease any Property to a New Operator, in connection with a transfer of the operations to such a New Operator, the Receiver may authorize or assist the New Operator, or prospective New Operator, in filing an application to become the licensed operator with the appropriate state agency, if such license may be required under the laws and regulations of Georgia or otherwise advisable for the continued operation of the Marshall Pines Facility as a senior housing facility;

s.   Conduct the operation of the Marshall Pines Facility at all times in accordance with customary industry standards in order to maintain and improve the standard of care for the residents of the Marshall Pines Facility, including without limitation providing all services required, necessary, and desirable for resident care;

t.   Operate the Marshall Pines Facility in compliance with applicable federal and state laws and regulations relating thereto and cause all permits, reimbursement contracts, and any other agreements necessary for the use and operation of the Marshall Pines Facility or, if applicable, as may be necessary for participation in Medicaid, Medicare, or other applicable reimbursement programs to remain in effect without reduction in the number of licensed beds authorized for use in the Medicaid, Medicare, or other applicable reimbursement programs;

u.   Negotiate with all applicable federal and state agencies to cure existing violations of federal and state laws and regulations, if any, including but not limited to issues relating to the segregation of resident funds from operational funds and the payment of all applicable state and federal taxes;

v.   Recruit, train and supervise all necessary employees, including the institution and amendment from time to time of general salary scales, personnel policies, and appropriate fringe benefits for all employees, which may include pension and profit sharing plans, insurance benefits and holiday, vacation, personal leave, and sick leave policies;

w.   Furnish to or obtain from the Marshall Pines Facility any and all policy manuals needed with reference to the operation of the Marshall Pines Facility and revise said policy manuals as is needed from time to time

13

to ensure that the Marshall Pines Facility complies with all applicable state and federal laws, regulations, and requirements;

x.    Institute standards and procedures for admitting residents, charging residents for services, and collecting the charges from the residents or third parties;

y.    Negotiate and enter into in the name of and on behalf of Evans and/or the Marshall Pines Facility, such agreements, contracts and orders as it may deem necessary or advisable for the furnishings of services, concessions, and supplies for the operation and maintenance of the Marshall Pines Facility;

z.    Implement a quality assurance program which shall include monthly audits of resident care in the following areas: (i) dietary services; (ii) housekeeping; (iii) laundry; and (iv) maintenance of educational programs, including without limitation reviewing the actual services provided at the Marshall Pines Facility, maintenance of a continuing education program to enhance the proficiency of the Marshall Pines Facility's staff, and technical assistance to the Marshall Pines Facility's staff in addressing problem areas discovered during the course of quality assurance audits;

aa.   Cancel, enforce or modify contracts, leases, or licenses relating to the Marshall Pines Facility; provided, however, that, except as otherwise ordered by the Court after notice and a hearing, the Receiver shall not cancel or impair any state or federal license necessary to operate the Marshall Pines Facility, nor enter into any non-cancelable contracts or leases having a duration of more than twelve (12) months without approval of the Plaintiff or Court approval;

bb.   Collect the rents, issues, accounts receivable, insurance claim proceeds, real estate tax refunds, utility deposits, security deposits, and profits from or related, in any way, to the Property from any time period, and to receive all rents and proceeds from ongoing operations of the Property (whether historical, current, or prospective), including without limitation security deposits, rents, accounts receivable, insurance claim proceeds, real estate tax refunds, utility deposits, security deposits, and earnest money deposits presently in the possession or control of Evans, the Marshall Pines Facility and/or their agents and the Receiver shall deposit the foregoing in bank account(s) for which the Receiver and/or its designated agent are the sole authorized signatory (the "Receiver Accounts");

cc.   Incur indebtedness as may be necessary for the operation and/or preservation of the Property, *provided that* written consent of the Plaintiff shall be required to the extent that such debt may impair the Plaintiffs rights in the Property, and *provided further that* should the Plaintiff agree to

14

provide financing to the Receiver for the operation and/or preservation of the Property or for the other costs and expenses of the receivership, then, under the terms of the Loan Documents, such amounts shall be deemed protective advances under the Loan Documents to the Receiver by the Plaintiff and such amounts shall be repaid on a first-priority basis and secured on a first-priority basis by the existing terms of the Original Loan Agreement and the Marshall Pines Mortgage;

dd.    Institute ancillary proceedings in this state or other states as are necessary to preserve and protect the Property or any assets of the receivership estate;

ee.    Do all things reasonable and necessary to promote the sound and reasonable financial management of the Property;

ff.    Remove the existing manager of the Marshall Pines Facility and hire a new manager, which may be an affiliate of the Receiver (the "New Manager").   Receiver is expressly authorized to enter into a management services agreement, substantially in the form attached hereto as **Exhibit 1,** with the New Manager at a monthly management fee equal to the greater of (i) $18,000 or (ii) 5.5% of Facility revenues *plus* out-of-pocket fees, costs, and expenses and any other fees agreed to therein;

gg.    With the approval of the Plaintiff, hire or retain any agents necessary or appropriate to perform any of the duties listed herein without further approval of this Court, including, but not limited to, accountants, attorneys, environmental consultants and personnel, brokers, leasing agents, property managers, operational managers, health care personnel, maintenance personnel, and/or security personnel;

hh.    Defend or institute and prosecute suits or summary proceedings related to the Property or the duties imposed upon the Receiver by this Order, including, but not limited to, proceedings: (a) for the collection of rents, income, and other amounts (which include residents or other tenants who have vacated their space); (b) for the removal of: (i) any resident or other tenants whose terms have expired and have not been renewed; or (ii) any other person(s) or entity(ies) unlawfully in possession of and of the Property; or (c) otherwise related to the Property or the duties imposed upon the Receiver by this Order;

ii.    Pay all or a portion of the outstanding obligations to creditors incurred in arm's length transaction who, prior to the entry of this Order, supplied materials, business supplies, and/or labor to or for the benefit of the Property, but only to the extent the Receiver shall determine, in its sole judgment, that it is prudent to do so in order to maintain resident care and provided that sufficient funds are available. For the avoidance of doubt, the

15

Receiver is not liable for and is not obligated to pay any other debts, claims or other obligations relating to the Property incurred before the date of entry of this Order, except for earned and accrued wages, vested benefits and related taxes, as well as checks that were issued and outstanding in the ordinary course before the date of entry of this Order; however, no claims, debts, liabilities, risks or obligations of any type shall be the personal risk or obligation of the Receiver or her agents or representatives; and

jj.   Take such other actions as may be reasonably necessary to conserve the Property and, so long as such actions are not in contravention of this Order or as otherwise authorized by the Court with the prior written consent of the Plaintiff.

5.   Without further order of the Court, the Receiver may engage a broker to market the Property for sale ("Broker"), so long as the agreement with the Broker is approved by the Plaintiff on terms and conditions acceptable to the Plaintiff in its sole discretion. Without further order of the Court (except as set forth in paragraph 5(d) below) and after consultation with the Plaintiff, the Receiver may take any and all steps necessary to market the Property for sale and enter into a transaction to sell the Property, which actions may include the following:

a.   The Receiver, in consultation with the Plaintiff, may cause all or part of the Property to be listed for sale at any price or prices the Receiver determines, in the exercise of its business judgment, after consultation with the Plaintiff, to be an appropriate list price.

b.   The Receiver, in consultation with the Plaintiff, may market the Property for sale in such manner as deemed reasonable in the exercise of its business judgment.   The Receiver will prepare marketing reports not less than quarterly which shall be provided to the Plaintiff.

c.   The Receiver, in consultation with the Plaintiff, may negotiate proposed sale terms with a buyer for the Property.

d.   If the Receiver reaches an agreement with a buyer of all or part of the Property and the Plaintiff, after consultation with the Plaintiff, consents to the terms and conditions of such sale, the Receiver shall file a motion with the Court for the approval of such sale.

6.   The Defendants and their respective partners, affiliates, subsidiaries, parents, related companies, employees, members, shareholders, representatives and agents (or other person

16

or entity in possession or control of the Property) shall deliver immediate possession of the Property to the Receiver, including to allow the Receiver to oversee the Property and the management thereof.

7.      The Defendants and their respective partners, affiliates, subsidiaries, parents, related companies, employees, members, shareholders, representatives and agents (or other person or entity in possession or control of such) shall promptly forward to the Receiver any and all mail or other communications concerning the Property.

8.      Within four (4) business days of the entry of this Order or as soon thereafter as reasonably practicable, and to the extent available and not already provided to the Lender or the Receiver, the Defendants and/or their respective agents (or other person or entity in possession or control of the following) shall provide or make available to the Receiver, whether in hard copy or electronic form, the following information (whether in the control or possession of the Defendants or the Defendants' agents or representatives or other person or entity in possession of control of the following information):

   a.   Evans' federal employer identification numbers;

   b.   Copies of any and all service contracts pertaining exclusively to the Property including without limitation any and all management agreements;

   c.   Copies of any and all leases, lease abstracts, purchase agreements, and the like pertaining exclusively to the Property;

   d.   All open invoices for services or goods relating to the Property;

   e.   A copy of the previous year-end financial statements and current year-to date (and month-by-month detail) in both hard copy and electronic format, including, without limitation, balance sheet, income statement, statement of financial affairs, profit and loss statements, accounts receivable (and receivables/arrearages aging), operating statements, current year budget, sources and uses of cash flow, detailed rent roll, accounts payable, check register, security deposit listing, trial balance, general ledger, contractor statements, lien waivers, sworn owner statements, construction draws,

17

bank reconciliations, and bank statements exclusively for Evans, as well as all licenses for financial and clinical software or other programs utilized exclusively in connection with the Property;

f.    A complete set of keys (including all masters) and all security and/or access codes and/or cards to the Marshall Pines Facility and a schedule (including full contact information) identifying each person or entity (including security companies, municipal/governmental agencies and utility companies) who currently has one or more keys and/or access cards to the Marshall Pines Facility or who has knowledge of any access codes thereto;

g.    Any and all records and information the Defendants may have concerning the Property, including, without limitation, all written and electronic books, records, correspondence, and other information related to: (i) any agreements to which the Property is or may be subject; (ii) any amounts received from the residents or tenants of the Property, including resident funds, for the past year or that pertain to current residents; (iii) all liens or other encumbrances on the Property; (iv) property taxes, assessments, and related appeals; (v) insurance of all types for the Property, including the Marshall Pines Facility, residents and tenants (including, but not limited to, liability, property, excess liability, auto liability, boiler and machinery, business interruption, professional liability, employee dishonesty, builders risk, construction related insurance, and workmen's compensation) related to the Property; (vi) all maintenance and service contracts; (vii) all invoices for services at the Property; (viii) all resident and tenant files, including leases, lease abstracts, purchase agreements, and sample leases for the past year and for current residents; (ix) a current and accurate copy of all electronic records for items related to accounting including tenant escalations/reconciliations for the past year and for current residents; (x) a list of all capital expenditures put into the Property since Evans assumed possession of the Property, including the Marshall Pines Facility, and any items of deferred maintenance and capital currently required; (xi) a full and complete resident census; (xii) all current or the most recent copy of any ALTA survey, Phase I and Phase II environmental reports, traffic studies, demographic studies, physical condition/engineering reports, building and life-safety code violations, zoning code information related to the Property, and appraisals; (xiii) all marketing information (in hard copy and electronic format) including, but not limited to, brochures, photographs (including aerial), maps, signage, and (xiv) all other aspects of the Property records that may be necessary or pertinent to the Receiver's management, maintenance, operation, and/or sale of the Property;

h.    Any and all insurance loss histories and/or claims on and concerning the operation and management of the Property, including the Marshall Pines Facility, for the past two years;

ACTIVE 699026412v7

i. Any and all other documents or other information relating to the Property and/or operation of the Marshall Pines Facility as reasonably requested by the Receiver, including without limitation health records, histories of residents or other medical or clinical records; and

j. All property and all other things of value associated with the use, operation, and maintenance of the Property, including the Marshall Pines Facility, which are owned by Evans.

For the avoidance of doubt, SRL shall not be required to disclose or provide any information or documentation related to its own materials, service providers, or operations, or with respect to other facilities SRL manages or operates; *provided that* (a) SRL shall provide the Receiver with access to, and use of, any policies, procedures, manuals and forms used solely for the Marshall Pines Facility (collectively, the "Policies") for up to thirty (30) days after entry of this Order; and thereafter, the Receiver's counsel shall have access to the Policies, if necessary, pursuant to a to be agreed upon protective order, for the Receiver's defense of or response to actual or threatened claims, audits, investigations or regulatory inquiries; and (b) to the extent that SRL has any national or other contracts in place with respect to the Marshall Pines Facility and such contracts are not in the name of Evans or the Marshall Pines Facility, SRL shall place orders under such contracts, on behalf of the Receiver, for up to thirty  (30) days after entry of this Order to allow the Receiver sufficient time to replace such contracts, provided the Receiver remits payment to SRL at the time the order is placed by the Receiver.

9. In addition to the items listed in Paragraph 8, in order to allow the Receiver full and complete access to any and all of Evans' or the Marshall Pines Facility's electronic records, systems, and information, within four (4) business days of the entry of this Order, the Defendants and/or their respective agents (or other person or entity in possession or control of the following) shall provide or make available to the Receiver any and all passwords for electronic systems owned

19

by Evans (whether for phones, databases, software systems, payroll records, medical records or otherwise), including, without limitation, the following:

a. All administrative passwords to computers, security systems, firewalls, domain and email accounts for the Property owned by Evans;

b. All local admin passwords for all computers at the Property or maintained by Evans with respect to the Property;

c. All administrative password information for all current email accounts owned by Evans;

d. All passwords for all local firewalls at the Property or with respect to the Property;

e. All passwords for all time clocks for all computers and computer systems at the Property or maintained with respect to the Property;

f. All passwords for internet providers to gain access to Evans' and the Marshall Pines Facility's accounts;

g. All passwords for all domain accounts at the Marshall Pines Facility or with respect to the Marshall Pines Facility; and

h. Any other passwords necessary for accessing systems owned by Evans or information necessary for the maintenance of the Property, the continued operations of the Marshall Pines Facility, and the ongoing delivery of resident care.

To the extent any of the above electronic records, systems, and information are owned by SRL or maintained on SRL's devices and systems, not Evans' devices and systems, then the information with respect to the Property will be made available to the Receiver, but SRL shall not be required to provide the Receiver with any of its passwords or general access its accounts, devices, systems, or other items that do not relate solely to the Property. For the avoidance of doubt, SRL will work with the Receiver to provide information available on the PointClickCare system and transfer such information as expeditiously as possible to the Receiver, but SRL shall not be required to share any passwords that would allow access to healthcare or other information of residents at other facilities operated by SRL.

20

10.     The Defendants (and all other persons or entities with authority to manage or operate the Property) are hereby directed to use their best efforts to insure a smooth transition of the operation and management of the Property to the Receiver or its designee.  The Defendants and their respective agents, principals, and managers (and all other persons or entities with authority to manage or operate the Property), shall take all reasonable actions requested by the Receiver to ensure that all accounts receivable payable by any person or organization owing monies to Evans, whether with respect to the Marshall Pines Facility or real property rentals or otherwise, are paid to the Receiver for deposit into the Receiver Accounts.  Such payments shall continue to be deposited into the Receiver Accounts until such persons or organizations are notified otherwise.

11.     The Defendants and any persons or entities acting under their direction, or any persons or entities managing the Property, are enjoined from in any manner disturbing or interfering with the Receiver's possession and management of the Property, and are prohibited and restrained from removing, leasing, encumbering, disposing of, conveying, dissipating, mishandling, or misappropriating any of the Property, including, without limitation, any cash in any bank accounts, or any of the books and records relating in any way to the Property, and are prohibited and restrained from collecting any rents or other sums due to it, until further order of the Court.

12.     The Defendants and their respective officers, directors, managers, members, affiliates, subsidiaries, related companies, shareholders, attorneys, professionals, representatives, employees and agents (and all other persons or entities in possession of or who have authority to manage or operate the Property) shall at all times after the entry of this Order provide reasonable cooperation to the Receiver for carrying out its duties hereunder, and timely respond to all

21

reasonable requests made by the Receiver.  The foregoing obligations to provide or make available to the Receiver the items and things identified herein shall be continuing.  The Defendants and their respective officers, directors, managers, members, affiliates, subsidiaries, related companies, shareholders, attorneys, professionals, representatives, employees and agents (and all other persons or entities in possession of or who have authority to manage or operate the Property) shall cooperate with Receiver in the orderly transfer of all resident funds and related deposit accounts and hold the Receiver harmless and indemnify Receiver and its agents for any claims by the federal or state governments or any residents that resident funds were comingled, mishandled or compromised in any way by the Defendants or their agents.  The Defendants (and all other persons or entities in possession of or who have authority to manage or operate the Property) shall take all actions necessary to keep and maintain all nursing home certificates of need, operating licenses and third-party payor agreements, and keep and maintain, as required by the Receiver, employment of any persons providing any services with respect to the Marshall Pines Facility.

13.     Unless and until removal or resignation in accordance with this Order, the Receiver shall continue in possession and operation of the Property during the pendency of the Plaintiff's claims in this matter, and during such further period as the Court may order.  Neither the Defendants nor anyone associated with them or acting under or in furtherance of the Defendants' authority or control shall:

      a.     possess or manage the Property in any way;

      b.     collect, withdraw or transfer, in any way, funds or revenue derived from operation of the Property, including the Marshall Pines Facility;

      c.     remove or destroy any part of the Property or any property relating to the Marshall Pines Facility;

      d.     terminate or cause to be terminated any license, permit, lease, contract or agreement relating to the Property; or

22

   e.  otherwise interfere with the Receiver's possession or operation of the Property or the Marshall Pines Facility.

  14. So long as any part of the Property remains in the Receiver's possession, the Receiver is directed to prepare and file with the Court, no less frequently than once every ninety (90) days, and within thirty (30) days after termination of the receivership, a full and complete financial report, under oath, pertaining to the operations of the Property, and setting forth receipts and disbursements and reporting acts and transactions regarding the execution of the trust of its office as the Receiver, including a current inventory of the funds, assets, and property remaining in the receivership, interest in and claims against the same, and all debts and obligations contracted and expenditures made (collectively, the "Receiver's Reports"). The Receiver is further directed to serve copies of each Receiver's Report on the attorneys of record for the Plaintiff and any other party who submits a written request to the Court and the Receiver to be served with copies of such reports. Any party having an objection to the Receiver's Report shall file a written objection with the Court no later than five (5) business days after the date of the Receiver's filing of the report. Any objection not filed within the deadline prescribed by this Order shall be deemed waived.

  15. The Receiver shall furnish to the parties' counsel copies of the Receiver's Reports and any additional information regarding the Property as required by law and as may be reasonably requested by them, but the Receiver is authorized to request instructions from this Court should any party request information on documents which are unduly burdensome or expensive to produce, or should any party make a request for information designed to annoy or harass or for any other improper purpose.

  16. The Receiver shall use commercially reasonable efforts to cause itself and New Manager (if applicable), to be named as insureds or additional insured parties on existing liability and property damage insurance policies on and/or for the Property and if needed, is authorized to

obtain customary insurance coverage for the Property upon approval of the Plaintiff. Upon the expiration of the paid portion of the existing insurance policy or policies, the Receiver shall have the responsibility for keeping the Property insured and may, at its option, keep in force the existing insurance policy or policies or obtain a new policy or policies for the Property, each of which shall name the Plaintiff, the Receiver and the New Manager (if applicable) as insureds or additional insureds thereunder, as the case may be. The Receiver shall have the power to cancel any existing insurance policy or policies and obtain a refund of paid but unused premiums, if any, which amounts shall become part of the receivership estate.

17.     To the extent applicable, this Order constitutes a Protective Order under the Health Insurance Portability and Accountability Act of 1996, as amended ("HIPAA"). The Receiver and its respective agents, representatives, and anyone acting on their behalves (the "Receiver Representatives"), shall be permitted to access confidential resident information pursuant to the terms of this Order. To the extent applicable, the Receiver and its respective agents, representatives, and anyone acting on their behalves shall implement the following procedures to safeguard the confidentiality of protected health information ("PHI"), as defined under HIPAA:

    a.    The Receiver and Receiver Representatives shall be prohibited from using or disclosing the PHI for any purpose other than for purposes of fulfilling the Receiver's responsibilities under this Order. The Receiver and Receiver Representatives shall use only the minimum necessary confidential information for such purposes;

    b.    The Receiver and Receiver Representatives shall implement appropriate safeguards to prevent review, use, or disclosure of PHI, including subjecting the Receiver and Receiver Representatives to the same standards regarding confidentiality of resident records as Evans under applicable laws, including HIPAA;

    c.    The Receiver and Receiver Representatives shall mitigate (to the extent reasonably practicable) any harmful effect that is known to them from a use or disclosure of PHI by them in violation of the requirements of this Order;

24

d.   The Receiver and Receiver Representatives must not make any paper or electronic copies of, or otherwise acquire, any PHI in the course of their duties, such that it is not necessary for them to return or destroy the PHI received at the end of all litigation; and

e.   Any other person with whom the Receiver retains, employs, or contracts, or who otherwise acts as an agent for the Receiver, shall abide by the same restrictions and conditions that apply to the Receiver with respect to PHI.

18.   Subject to revision by the Court, the Receiver shall be compensated as follows:

a.   The Receiver shall be paid a monthly fee of $10,000.  The fee shall be payable in advance on a monthly basis on the first day of each month; provided that to the extent that Receiver's services begin on a day other than the 1st day of a month, such services shall be prorated for such first month. The amount set forth in this subsection (a) shall be the "Receiver Fees;"

b.   Receiver shall be reimbursed all reasonable costs and expenses incurred by the Receiver, including their counsel, in fulfilling the Receiver's obligations and duties set forth herein (the "Receiver Costs"); and

c.   Any other reasonable fees and/or costs of Receiver and their counsel, shall be paid as set forth by this Order and this Court.

19.   Should the income and proceeds from the Property and operation of the Marshall Pines Facility be insufficient to compensate the Receiver (including, without limitation, any fees and expenses incurred by the Receiver's counsel) or to cover the operating costs and expenses of the Property as set forth herein, and pursuant to such other agreements that may be entered into between the Plaintiff and the Receiver, the Plaintiff will be obligated to pay any and all fees and expenses incurred by the Receiver relating to the performance of the Receiver's duties under this Order, including without limitation the Receiver Fees, Receiver Costs, and operating costs and expenses of the Property, provided that the Plaintiff's obligation to pay operating expenses of the Marshall Pines Facility shall be limited expenses set forth in a budget ("Budget") to be agreed upon by and between the Receiver and the Plaintiff.

25

20.     The Receiver may at any time, in its sole discretion and business judgment, file a motion requesting that it be exonerated, discharged, and released from its appointment as the Receiver, and such motion shall be scheduled and heard on an expedited basis, and it shall be grounds for immediate discharge of the Receiver, upon the Receiver's request, if the Receiver is not timely paid, there are insufficient funds to operate the Property, or the Plaintiff fails to comply with its obligations set forth in Paragraph 19 or pursuant to any further agreement between the Plaintiff and the Receiver with respect to the payment of operating expenses.

21.     Upon request, the Receiver will provide the Plaintiff and its counsel with an invoice detailing the Receiver Fees and Receiver Costs on a monthly basis. If so provided, the Plaintiff's objections to any invoice shall (a) be in writing; (b) be sent to the Receiver by e-mail within ten (10) calendar days of the date the invoice is e-mailed; and (c) describe, in detail, the factual basis for each specific entry subject to such objection. If the Receiver does not receive any timely asserted objection from the Plaintiff, it shall be authorized to pay such invoice on the eleventh (11th) calendar day following the date the invoice is e-mailed from receipts generated from the operation of the Property or pursuant to Paragraph 19 of this Order or further agreement of the Plaintiff and the Receiver. If an objection is received timely from the Plaintiff, the Receiver may pay all fees, costs, and expenses not subject to the objection. All fees, costs, and expenses subject to the objection may be paid after (x) resolution with the objector confirmed in writing; or (y) entry of an Order from this Court allowing payment of the fees, costs, or expenses.

22.     The Receiver shall be authorized to employ attorneys to represent its interests in this case, which attorneys shall submit statements for services performed and costs and fees incurred in conjunction with the statements submitted by the Receiver and in the same manner as is provided in Paragraph 21 of this Order.  Counsel for the Receiver shall further be paid as

26

provided for in Paragraph 21 of this Order and in agreements that may be entered into between the Plaintiff and the Receiver.

23.     The Receiver is being appointed expressly to preserve, protect, and maintain the value of the Property.

24.     Neither the Receiver, the Plaintiff, nor others acting on their behalves will be liable (a) for any damage, injury, or cause of action arising out of or related to the Property, including the Marshall Pines Facility and their respective operations, or the execution of the Receiver's duties and powers under this Order; or (b) to any person or entity for the payment, or failure to pay, expenditures arising from the Property, including the Marshall Pines facility and its business operations.

25.     The Receiver, the Plaintiff, and their employees, agents, and attorneys shall have no personal liability and they shall have no claim asserted against them relating to or arising out of the execution of the Receiver's duties and powers under this Order, including without limitation (a) for any damage, injury or cause of action arising out of or relating to the Property; (b) the execution of the Receiver's duties or the performance of any duty or obligation hereunder; (c) for failure to pay expenditures arising from the Property or the operation of the Marshall Pines Facility; or (d) in connection with any liabilities, obligations, liens, taxes, or amounts owed to any of Evans' or the Marshall Pines Facility's creditors because of their actions under the receivership. Nothing in this Order shall grant any rights to trade creditors or general unsecured creditors, whose rights shall be solely determined in accordance with applicable law.  To the extent the Receiver decides to continue the services of any current employees agents or other personnel with respect to the Property, neither the Receiver nor any person or entity engaged by the Receiver hereunder shall be liable for any claims of any nature whatsoever of such employees, agents or other

*ACTIVE 699026412v7*

personnel that arose prior to the date and time of the entry of this Order, which claims include, but are not limited to, liabilities related to unemployment and/or worker's compensation claims.

26.     No person or entity shall file suit against the Receiver, or take other action against the Receiver, without notice to the Receiver and all parties to this action and an order of this Court permitting a suit or action; provided, however, that no prior Court order is required to file a motion in this action to enforce the provisions of this Order or any other order of this Court in this action.

27.     All persons who have a Claim[1] (except the Plaintiff) against the Property are hereby enjoined from (a) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding that was or could have been commenced before the commencement of the receivership, or to recover a Claim against the Property that arose before the commencement of the receivership; (b) the enforcement against the Property of a judgment obtained before the commencement of the receivership; (c) any act to obtain possession of, or to exercise control over, the Property; (d) any act to create, perfect, or enforce any lien against the Property; (e) any act to create, perfect, or enforce against the Property any lien to the extent that such lien secures a Claim that arose before the commencement of the receivership; (f) any act to collect, assess, or recover a Claim against the Property that arose before the commencement of the receivership; and (g) the setoff of any debt owing to Evans that arose before the commencement of the receivership against any Claim against the Property (collectively, a "Pre-Receivership Claim"). However, any and all statutory or contractual limitation periods applicable to any cause of action arising out of or in connection with a Pre-Receivership Claim, to

---

[1] "Claim" means (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

the extent that any such statutory or contractual periods of limitation have not expired as of the date of this Order, shall be hereby tolled during the pendency of this Order.  This shall mean that any applicable statutory or contractual periods of limitation that have begun to run shall be interrupted and cease running during the pendency of this Order.  Holders of any such Pre-Receivership Claims may, however, send the Receiver written notice of such claims, along with supporting documentation, in order for the Receiver to review such claims, and such creditors shall be permitted to discuss with the Receiver the nature of such claims (and when and how they might be paid in the future).  This paragraph shall not apply to any enforcement action brought forth against the Defendants by the Plaintiff.

28.     The Receiver shall not be required to post with the Clerk of the Court a security bond.

29.     The Receiver is authorized to take all actions specifically set forth in this Order, as well as exercise the usual and customary powers afforded to a receiver under federal law, except as otherwise limited by any order of this Court.  The Receiver shall not have any responsibility for the preparation or filing of any tax return of any kind for the Defendants.

30.     The Receiver is authorized to apply to the Court at any time, with notice to all other parties entitled to notice in this case, for further instruction and for further power necessary to enable the Receiver to properly fulfill its duties.

31.     The Receiver may not resign without leave of the Court.  In the event of removal or resignation, a new Receiver shall be appointed by the Court.

32.     Notwithstanding any of the provisions of this Order, nothing in this Order shall in any way limit, alter, or impair the rights and interests of the Plaintiff under the applicable loan documents or applicable law with respect to the Defendants, the Property, the Marshall Pines

29

Facility, or any matter relating thereto. For the avoidance of doubt, nothing set forth in this Order shall prejudice or affect the Plaintiff's rights under the Mortgages (as defined in the Complaint) to pursue, *inter alia*, foreclosure of the Plaintiff's liens and interests in the Property subject to this receivership, provided that the Plaintiff shall provide notice to the Receiver in connection with such action and notice to the Defendants under applicable law.

33. The Receiver or any other party in interest, at any time, on proper notice to the parties who have appeared in this action, may apply to this Court for further or other instructions or powers necessary to enable the Receiver to properly fulfill its duties hereunder.

34. The Court finds there is no just reason for delay and therefore enters this Order as a final order.

Dated: June 24, 2024

BY THE COURT:

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA

30

# EXHIBIT 1

## NEW MANAGER'S MANAGEMENT SERVICE AGREEMENT

31

## MANAGEMENT SERVICES AGREEMENT

**THIS MANAGEMENT SERVICES AGREEMENT** ("Agreement") is made and entered into as of the Effective Date (defined below) by and between, [●] ("Manager"), and Evans Care Group, LLC ("Operator"). Manager and Operator may be referred to herein, collectively, as the "Parties" and, individually, as a "Party."

### W I T N E S S E T H:

**WHEREAS**, Operator operates a licensed assisted living community in Georgia as more specifically described on **Schedule A** (the "Facility"), attached hereto and incorporated herein;

**WHEREAS**, Manager is experienced in providing management services to, and otherwise advising on the operations of, facilities similar to the Facility;

**WHEREAS**, Operator desires to engage Manager to manage the Facility as Operator's agent, in accordance with the terms and conditions of this Agreement.

**NOW, THEREFORE,** for and in consideration of the mutual covenants and conditions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## SECTION 1. AUTHORITY OF THE PARTIES

**1.1 Control Retained in Operator and Delegation of Authority to Manager.** Operator shall retain the ultimate authority and responsibility regarding the powers, duties and responsibilities vested in Operator by law and regulations with respect to the operation of the Facility. Subject to the foregoing, Operator hereby delegates to Manager the authority to manage the Facility and to perform the specific functions set out herein in accordance with policies adopted and other directions given by the Operator.

**1.2 Approval by Operator.** Wherever the approval of Operator is required under this Agreement, it shall be evidenced through a written communication from an authorized representative of Operator. Operator will examine documents submitted by Manager and render reasonable decisions pertaining thereto, when required, promptly, to avoid unreasonable delay in the progress of Manager's work, and, in any event, if Operator has not respond negatively in writing to the notice within fifteen (15) days after receipt, or such lesser period of time as required under the circumstances, Operator shall be deemed to have approved the matter submitted to Operator. In any emergency situation (as reasonably determined by Manager), Manager shall not be required to seek or obtain Operator's approval for any actions which Manager, in its reasonable judgment, deems necessary or appropriate to respond to such situation, provided Manager promptly thereafter reports such action to Operator in writing. Operator shall execute and deliver any and all applications and other documents that may reasonably be deemed by Manager to be necessary or proper to be executed by Operator in connection with the operation of the Facility

## SECTION 2. MANAGER'S RESPONSIBILITIES

**2.1 General Responsibilities.** Provided that Operator makes adequate funds available, Manager shall perform the functions and tasks set forth herein in accordance with (a) generally accepted management techniques for facilities similar to the Facility, (b) the reasonable exercise of its judgment, and (c) the policies adopted, and other directions given, which may be modified from time-to-time, by Operator; provided, that the policies adopted by Operator shall be reasonable and consistent with the statutes, rules and regulations of the state where the Facility is located, and with the terms of this Agreement, and shall be delivered in writing to Manager. Manager shall be responsible for managing the Facility in a professional and workmanlike manner and with the same degree of diligence, care and skill as is employed by managers of facilities similarly situated to the Facility. Manager shall use Reasonable Efforts (defined below) to manage the Facility in substantial compliance with all obligations imposed on Operator that are known to Manager. For purposes of this Agreement, "Reasonable Efforts" shall mean such efforts as would be expended by a reasonably prudent person engaged in advising facilities similarly situated to the Facility.

**2.2 Planning.** Manager will assist Operator in reviewing short-, medium- and long-range objectives for the Facility and in formulating recommendations with respect thereto.

**2.3 Employment and Supervision of Employees of the Facility.** All employees of the Facility will be employees of the Operator and shall be hired, fired, supervised by, subject to the policies and oversight of Operator. Operator shall not hire any employees of Manager or its Affiliates without the prior written consent of Manager.

**2.4 Licenses, Permits and Certifications.** Manager shall use Reasonable Efforts to assist Operator in obtaining and maintaining the Facility's licenses, permits, certifications, and other approvals, in good standing, required for management and operation of the Facility.

**2.5 Resident Agreements.** To the extent applicable, Manager shall negotiate, enter into, cancel and terminate rental agreements with residents of the Facility ("Resident Agreements"). All Resident Agreements shall state that Manager is acting as agent on behalf of Operator and shall be entered into in the name and on behalf of Operator. Operator hereby grants to Manager a limited power of attorney for purposes of administering the Resident Agreements on behalf of Operator, as provided hereunder. Manager shall use the form of Resident Agreement for the Facility that the Operator provides to Manager; provided, that such Resident Agreement form complies with applicable law. In no event shall Manager enter into any Resident Agreement for a term of more than one (1) year without Operator's approval. Manager shall use good-faith efforts to secure compliance by residents with the terms and conditions of their Resident Agreements. Manager shall inform all residents of rules, regulations and notices as may be promulgated by Manager in conjunction with management of the Facility. In addition, Manager shall, subject to the other provisions of this Agreement, schedule and coordinate resident moves, maintain or cause the Facility's employees to maintain personal contact with residents and their families and sponsors and serve as liaison for Operator to receive and resolve resident complaints timely and courteously. Manager shall collect, deposit and disburse security deposits, if required, and resident trust funds in accordance with the terms of each resident's Resident Agreement and applicable law.

2

Notwithstanding anything hereunder to the contrary, in all circumstances, Manager shall not interfere with residents' free choice of facility relating to services provided by Operator.

**2.6  Licensed Vehicles.** Manager may purchase or lease motorized vehicles from time-to-time in connection with the operation of the Facility, as reasonably requested by Operator and agreed to by Manager. Vehicles purchased or leased by Manager on behalf of Operator will be registered and titled to Operator. Manager, through its agents and employees, will have charge of the operation and maintenance of these vehicles and shall use the same exclusively for the benefit of the Facility. Manager shall use commercially reasonable efforts to ensure that all persons operating any such vehicles are duly licensed, including holding such special licenses as are required for the particular class(es) of the vehicles and their use, and shall request periodic driving history reports regarding each vehicle operator from the applicable motor vehicle agency consistent with applicable law. Manager shall maintain and operate the vehicles, and all reasonable costs related thereto shall be reimbursed.

**2.7  Legal Actions.**  Manager shall provide Operator with input, including as to the selection of legal counsel retained at the expense of Operator, to assist Operator in initiating, defending and pursuing, in the name and on behalf and at the expense of Operator, any and all legal actions or proceedings necessary to operate the Facility and protect its assets; provided, however, that if Manager determines that extraordinary efforts not reasonably covered by the fee arrangements embodied in this Agreement will be required in connection with any legal action or proceeding, the Parties shall negotiate in good faith a special fee in connection therewith. Manager shall not provide legal advice to Operator, and no actions of Manager shall be interpreted as legal advice.

**2.8 Rates.**  Manager shall provide input to assist Operator in establishing rate structures for the Facility that, to the extent practicable, take into account the financial obligations of Operator and the necessity of providing quality care at a reasonable cost.

**2.9 Insurance.**  Manager shall provide input to assist Operator in obtaining on behalf, for the account, and at the expense of Operator, insurance with respect to the Facility with such limits as are usual and customary, and in compliance with applicable legal requirements, for facilities similar to the Facility, and Manager and its Affiliates, if applicable, shall be named insureds on all such policies. As used in this Agreement, the term "Affiliate(s)" means, with respect to a Party, any other person or entity that, directly or indirectly, controls, is controlled by, or is under common control with such Party and their respective officers, directors, managers, members, shareholders, employees, agents, representatives, successors and assigns. The term "control" means possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Party, whether through the ownership of voting securities or equity interests, by contract, or otherwise. For purposes of this Agreement, "Affiliate," when used in reference to Manager, does not include Operator.

3

**2.10 Purchase of Equipment and Supplies.** In accordance with the Budget, Manager shall cause the purchase, in the name, for the account, and at the expense of the Facility, of equipment, operating supplies (including, without limitation, food, beverages, medical, cleaning and office supplies), and other materials and supplies, which may reasonably be needed for the maintenance and operation of the Facility, provided that Operator makes adequate funds available.

**2.11 Ancillary and Other Agreements.** As necessary, Manager shall, in the name directed by Operator and, for the account and at the expense of Facility, negotiate and enter into such agreements as Manager may deem necessary or advisable for the furnishing of utilities, services, concessions and supplies for the maintenance and operation of the Facility.

**2.12 Repairs and Renewals.** Provided Operator makes adequate funds available, Manager shall negotiate, contract for (in the name directed by the Operator and for the account and at the expense of Facility) and supervise repairs and renewals of the physical property and equipment of the Facility as shall be reasonably necessary to keep and maintain such property in good working order and condition.

**2.13 Compliance with Laws.** The Parties shall, at Operator's expense, take such Reasonable Efforts as shall be necessary to ensure the Facility will substantially comply, in all material respects, with federal, state and local laws, rules, regulations and ordinances applicable to Facility or the operation thereof, including the Health Care Laws (defined below). Neither Manager nor its Affiliates shall provide legal advice to Operator, and no action or statement by them shall be deemed legal advice. In the event the terms of this Agreement or the actions taken hereunder by Manager or Operator, at any time, shall fail to comply with any federal, state or local law, rule, regulation or ordinance, such failure shall, at the sole cost and expense of Operator, be cured as soon as practicable by Manager or Operator and, to the extent such failure requires the modification of this Agreement, Manager and Operator agree to negotiate in good faith such mutually acceptable modification as will cause this Agreement to comply with all applicable rules, laws, regulations and ordinances. Any disputes regarding modifications of this Agreement to comply with Health Care Laws shall be resolved in the manner set forth in <u>Section 7.10</u> of this Agreement. Notwithstanding the foregoing, if adequate funds are not made available by Operator for Manager's performance in compliance with this Section, such failure shall constitute grounds for termination by Manager, and as such, shall be deemed a termination by Operator without cause. As used in this Agreement, "Health Care Laws" means Title XVIII of the Social Security Act (42 U.S.C. §§1395-1395hhh); Title XIX of the Social Security Act (42 U.S.C. §§1396-1396v); the federal Anti-kickback Act of 1986 (41 U.S.C. §§51-58); the federal Anti-kickback Statute (42 U.S.C. §1320a-7b); the federal False Claims Act (31 U.S.C. §3729 *et seq.*); the federal Program Fraud Civil Remedies Act (31 U.S.C. §§ 3801-3812); the federal Civil Monetary Penalties Law (42 U.S.C. §1320a-7a); the federal Exclusion Laws (42 U.S.C. §1320a-7); any applicable state and local laws similar to the foregoing; any other applicable federal, state, or local laws and rules governing licensure, certification, corporate practice of medicine, fee-splitting, anti-kickback, self-referral, billing or reimbursement; and any other health care fraud and abuse laws and compliance guidance, advisory opinions, and special fraud alerts published by the Office of the Inspector General of the Department of Health and Human Services or any applicable state governmental agency. Furthermore, nothing contained in this Agreement shall require (directly or indirectly, explicitly or implicitly) either Party to refer or direct any residents or other business payable, in

4

whole or in part, by a federal healthcare program or any other payor, to the other Party, to otherwise refer or generate business for the other Party, or to use any of the other Party's other services or facilities as a precondition to entering into this Agreement.

**2.14 Access to Facility.**  Except for proprietary information and systems belonging to Manager, Manager shall make available to Operator, and its agents and representatives, for inspection and/or copying by them, upon request, all books, records and financial data relating to the Facility in Manager's possession and shall make available a representative of Manager, who shall be reasonably acceptable to Operator, to discuss the affairs of the Facility upon reasonable notice.

**2.15 Notice of Default or Event of Default.**  Each Party shall provide the other with prompt written notice of any default or event of default under any financing documents with respect to the Facility of which the notifying Party has actual notice.

**2.16 Surveys.** Manager shall provide Operator with copies of all licensure, complaint, and/or certification surveys conducted at the Facility and all plans of correction prepared and implemented in response thereto.

**2.17 Billing and Collection of Accounts.**  Pursuant to billing and collection policies established by Operator, Manager shall provide Operator with input to assist Operator in the billing and collection of all amounts due Operator with respect to the Facility.

**2.18 Capital Expenditures.**  Manager shall review and make recommendations to Operator with respect to non-budgeted capital expenditures exceeding $10,000 and upon receipt of Operator's approval, shall negotiate, contract for (in Operator's name) and supervise the construction or installation of such capital items.  Except for non-budgeted capital expenditures which have been approved by Operator as aforesaid and those expenditures required by applicable law, all capital expenditures with respect to the Facility for the applicable fiscal year shall be made only in substantial accordance with the general category amounts therefor set forth in the Budget for such period, as approved by Operator pursuant to <u>Section 2.19</u> of this Agreement; provided, that Manager may make capital expenditures not contemplated by the Budget in aggregate amounts not to exceed $10,000 in any fiscal year without obtaining approval of Operator.

     (a)    Each Budget shall include a capital budget outlining a program of capital expenditures as may be required by applicable law or in the reasonable business judgment of Manager, during the next fiscal year, in which each proposed capital expenditure will be designated as either mandatory, highly recommended or desirable. In addition, each recommendation by Manager with respect to non-budgeted capital expenditures shall likewise segregate such proposed expenditures into mandatory, highly recommended and desirable categories. Operator may approve or reject, in its discretion, each proposed capital expenditure. Operator shall not unreasonably withhold or delay its consent to mandatory or highly recommended capital expenditures. Manager shall be responsible for designating as a "<u>Mandatory Capital Expenditure</u>" any expenditure which,

if not made would, in the judgment of Manager: (1) cause the Facility to lose or put at risk its license; (2) place at risk the safety of a resident or employee of the Facility; (3) cause the ineligibility of the Facility under any federal healthcare program or commercial third-party payor program applicable to the Facility; or (4) subject Operator or Manager to criminal prosecution.

(b)     If Operator refuses to approve a Mandatory Capital Expenditure, the following provisions shall apply unless and until Operator approves such Mandatory Capital Expenditure: (1) Operator shall indemnify, defend and hold Manager and its Affiliates harmless from and against any and all liabilities, claims and actions arising out of or caused by such refusal; and (2) until such Mandatory Capital Expenditure is actually funded, Manager shall have the right to terminate this Agreement on (30) days written notice.

**2.19 Preparation and Adoption of Annual Budgets.** Manager shall provide Operator with input to assist Operator in preparing an annual budget for the Facility (a "Budget"), which sets out anticipated revenues, expenses, cash flows, and capital expenditures. Capital expenditures shall be in accordance with Section 2.18 of this Agreement.

**2.20 Accounting and Tax Records.** Manager shall provide Operator with input to assist Operator, at Facility's expense, with the preparation of all required tax returns, cost reports, and all financial statements with respect to the Facility.

**2.21 Management Information Systems.** Manager shall provide Operator with input to assist Operator in selecting and maintaining, at Operator's expense, adequate financial and non-financial management information systems with respect to the Facility.

**2.22 Additional Reports**. To the extent specifically requested in writing by Operator, Manager shall provide Operator with input to assist Operator in preparing such other reports as agreed to by the Manager.

**2.23 Bank Accounts and Working Capital.** Manager, in the name of the Operator, shall deposit all revenues of the Facility immediately upon receipt, but in no event less frequently than daily into a bank account or accounts of the Facility in the name of Operator (the "Operating Accounts") and shall supervise disbursements therefrom. Operator shall provide Manager with access and authority to write checks for required expenses out of the Operating Accounts. All costs and expenses (including Manager's Fees) incurred in connection with the Facility shall be paid out of the Operating Accounts.

**2.24 Other Services to Be Provided by Manager.** In addition to the foregoing services, during the term of this Agreement, Manager shall, in the name of Operator, and provided Operator makes adequate funds available, use Reasonable Efforts to:

(a)     Provide Operator, as requested from time-to-time, with input for Operator's instituting and amending general salary scales, personnel policies and

6

appropriate employee benefits for all employees of the Facility, including implementation of collective bargaining agreements, if applicable;

(b)     Plan, supervise and conduct a program of regular maintenance and repair;

(c)     Administer, supervise and schedule all non-medical services of the Facility, including the provision of food, barber/beautician and other ancillary services;

(d)     Institute standards and procedures for admitting and discharging residents, as applicable;

(e)     When requested, furnish to Operator for review and adoption, any and all policy manuals needed with reference to the operation of the Facility and propose revisions to said policy manuals as may be needed from time-to-time to reasonably assure that the Facility complies with all applicable local, state and federal laws, regulations and requirements;

(f)     If Manager determines that extra-ordinary efforts not reasonably covered by the fee arrangements embodied in this Agreement will be required in connection with any input or assistance to Operator with respect to any employee relation matter or union negotiation, or should Operator elect to have Manager as its representative for any employee relation matter or union negotiation, the Parties shall negotiate in good faith a special fee in connection therewith;

(g)     Coordinate rental of equipment, as Manager may deem reasonable, necessary or desirable in connection with the operation of the Facility;

(h)     Assist Operator with marketing activities, including developing marketing materials, programs and other related activities as reasonably requested by Operator for the Facility; and

(i)     Any other services mutually agreed to by the Parties.

All costs and expenses payable to third parties to facilitate or implement the activities and services set forth in this Section 2.24 shall be borne by Operator and provided at Operator's sole cost and expense.

7

**SECTION 3. FEES**

    **3.1 Management Fee.** Upon execution of this Agreement, Operator shall pay Manager an advance payment retainer ("Retainer") in an amount equal to Eighteen Thousand Dollars ($18,000). The Retainer shall be held by Manager and applied to the last invoice issued to Operator after termination of this Agreement.

        (a)    Beginning on the Effective Date (defined below) and on or before the fifth (5th) day of each month during the Initial Term, Operator shall pay Manager a monthly management fee (the "Monthly Management Fee"). The Monthly Management Fee will be equal to the greater of (a) Eighteen Thousand Dollars ($18,000) as a monthly flat fee for Services (the "Minimum Management Fee"), or (b) Five and One-Half Percent (5.5%) of Manager's estimate of the prior calendar month's Net Resident Revenues (defined below). A true-up of the estimated portion of the Monthly Management Fee compared to the exact amount of the Monthly Management Fee based on 5.5% of each prior month's actual Net Resident Revenues will be prepared by Manager within sixty (60) days of the end of each month, and any resulting refund to Operator or additional payment to Manager shall be made within fourteen (14) days after Manager's provision of the monthly true-up ("True-Up"). "Net Resident Revenues" shall mean the aggregate gross revenues generated from Manager's provision of services to the Facility's residents during the term of this Agreement, net of contractual adjustments.

        (b)    A start-up fee of Ten Thousand Dollars ($10,000) ("Start-Up Fee") due and payable upon execution of this Agreement.

        (c)    In connection with a sale of the Facility (whether by merger, asset sale (including without limitation an asset sale in connection with any receivership, reorganization, assignment for the benefit of creditors or bankruptcy under sections 105, 363, 365 or 1129 of title 11 of the United States Code), stock sale, reorganization, change in control transaction, or other similar transaction), Operator shall pay Manager a one-time fee in the amount of Fifteen Thousand Dollars ($15,000) (the "Sale/Transition Fee"), payable upon the consummation of such sale of the Facility, which fee is intended to compensate Manager for the increased work required by Manager to assist in effectuating any such sale of the Facility. Operator's obligation to pay such Sale/Transition Fee shall survive and continue after the termination or expiration of this Agreement and include any such sale that is consummated after such termination or expiration of this Agreement unless Operator terminates this Agreement for cause pursuant to Section 6.3(a). The Sale/Transition Fee does not include any services to be performed by Manager with respect to the winddown of Operator after closure or after the sale closing ("Winddown Services"). To the extent that Operator wishes to engage Manager to perform Winddown Services, the

8

scope and cost of such Winddown Services shall be negotiated between Operator and Manager and memorialized in a separate agreement acceptable to Operator and Manager.

(d)    The Retainer, Monthly Management Fee, Start-Up Fee and the Sale/Transition Fee shall collectively be referred to as the "Fees." Manager shall be paid the Fees in addition to all other reimbursements due Manager for expenses incurred and payable hereunder.

**3.2 Reimbursements.**  Operator shall reimburse Manager promptly for any third-party costs and expenses incurred by Manager, whether on an emergency basis or otherwise, in implementing the activities and services under this Agreement, which third-party costs and expenses expressly include, without limitation, Manager's attorney's fees, and any other legal costs, incurred in negotiating the terms of this Agreement or otherwise implementing this Agreement. Operator also shall reimburse Manager for ordinary and necessary expenses incurred by Manager in connection with the Facility, including travel, food and housing.  Manager shall not be entitled to be reimbursed for home-office overhead or for any part of the compensation benefits or other payments to any directors, officers or employees of Manager.  Reimbursements will be invoiced by Manager to Operator and, as long as such invoice is provided seven (7) days in advance of the Manager's monthly invoice for its Fees, shall be payable in full by Operator at the time of Operator's next payment of the Fees; provided, however, that any costs and expenses that are incurred by Manager before execution of this Agreement and subject to reimbursement under this Section, shall be invoiced by Manager within seven (7) days of the Parties' mutual execution of this Agreement and payable by Operator within seven (7) days of the date of such invoice.

**3.3 [Reserved]**

**3.4 Non-Budgeted Expenditures.**

(a)    All expenditures with respect to the Facility for the applicable fiscal year shall be made only in substantial accordance with the general category amounts therefor set forth in the Budget for such period as approved by Operator; provided, that Manager may make expenditures not contemplated by the Budget in aggregate amounts not to exceed $10,000 (which amount shall include non-budgeted, unapproved capital expenditures) in any fiscal year without the approval of Operator.

(b)    Notwithstanding the provisions of clause (a) above or any other provision of this Agreement to the contrary, in the event of an emergency in which it is not practicable to obtain the prior approval of Operator and prompt action is required for the protection and safety of the Facility or the residents and staff therein or for the protection of the operating license of the Facility, Manager shall be entitled to take any required or necessary action without the prior approval of Operator, following which a report of the occasion for such action and the action taken shall be made to Operator.

9

**3.4 Fair Market Value.** The Parties hereby acknowledge and agree that the Fees and other payments required hereunder are consistent with fair market value and have not been determined in any manner that takes into account, directly or indirectly, the volume or value of any referrals or other business generated between the Parties.

**SECTION 4. REPRESENTATIONS,   WARRANTIES   AND   COVENANTS; INDEMNIFICATION**

**4.1 Representations, Warranties and Covenants of Operator.**   Operator makes the following representations, warranties and covenants which are material representations and warranties upon which Manager relied as an inducement to enter into this Agreement:

(a)   Status of Operator.   Operator is a limited liability company duly organized and validly existing in good standing and has all necessary power to carry on its business as now being conducted, and through the Term, to manage and operate the Facility, as now being operated, to carry on its contemplated business, to enter into this Agreement and to observe and perform its terms.

(b)   Authority of Due Execution.   Operator has full power and authority to execute and to deliver this Agreement and all related documents and to carry out the terms hereof and thereof; and such execution and delivery and such performance will not with the passing of time, the giving of notice, or both, result in a default under or a breach or violation of (i) its Articles of Incorporation, Bylaws, or other organization/governance agreement of Operator; or (ii) any law, regulation, court order, injunction or decree of any court, administrative agency or governmental body, or any mortgage, note, bond, agreement, lease, license, permit or other instrument or obligation to which Operator is now a party or by which Operator or any of its assets may be bound or affected.   This Agreement constitutes a valid and binding obligation of Operator, enforceable in accordance with its terms, except to the extent that its enforceability is limited by applicable bankruptcy, reorganization, insolvency, receivership or other laws of general application or equitable principles relating to or affecting the enforcement of creditors' rights.

(c)   Litigation.   There is no litigation, claim, investigation, challenge, or other proceeding pending or, to the knowledge of Operator, threatened against Operator, its properties, including the Facility, or business which seeks to enjoin or prohibit it from entering into this Agreement or which, if adversely determined, would have a material adverse effect on Operator or its financial condition or on the Facility.

(d)   Cooperation.   Operator will cooperate with Manager in every respect to allow Manager to perform its services under this Agreement and will furnish Manager with all information required by it for the performance of its services under this Agreement.   Operator will permit Manager full access

10

to the Facility and will allow Manager to examine any data in the possession and control of Operator affecting operation of the Facility.

(e) <u>Ownership of Materials</u>.  Manager agrees that, except for any systems, policies and other information which are Manager's proprietary materials prior to the date of this Agreement which Manager uses at the Facility, and which shall remain Manager's proprietary materials (collectively, the "<u>Manager Materials</u>"), Operator retains all ownership and other rights in all proprietary systems, policies, manuals, materials and other information, in whatever form, developed by Manager for use in the Facility in the performance of its services under this Agreement, such materials being deemed "Work for Hire."  Nothing contained in this Agreement shall be construed as a license or transfer of any Manager Materials either during the Term or otherwise.

(f) <u>Insurance</u>.  Operator shall obtain and maintain at its own expense appropriate policies ("<u>Policies</u>") of insurance providing coverage for the Facility including workers' compensation, comprehensive general liability and professional liability, vehicular and all-risk property insurance, having such limits and deductibles, and upon such terms and conditions, as are common and customary for facilities located in the general vicinity in which the Facility is located and with carriers reasonably acceptable to Manager. Manager and its Affiliates, as applicable, shall be named insureds under the Policies and shall thereby be entitled to the full protection afforded to any other named insured under the Policies.  The Policies shall be non-cancelable and non-amendable unless notice in writing is given to Manager not less than ten (10) days prior to the effective date of any cancellation or amendment (but such notice shall not derogate from the continuing obligation to maintain insurance pursuant to this Agreement).  A duplicate original of each Policy with all endorsements, any amendments thereto, and all certificates of renewal shall timely be provided to Manager.  If any Policy is a claims-made policy and not an occurrence policy, either appropriate claims-made or tail insurance shall be maintained in full force for the longer of (i) three (3) years or (ii) such period of time, after termination of this Agreement, required under applicable law to continue to provide insurance protection to Manager pursuant to this Agreement, with respect to occurrences prior to the termination of this Agreement.  This obligation shall survive the expiration of this Agreement or the termination of Manager's services hereunder.

**4.2 Representations, Warranties and Covenants of Manager.**  Manager makes the following representations, warranties and covenants which are material representations and warranties upon which Operator relied as an inducement to enter this Agreement:

(a) <u>Status of Manager</u>. Manager is a limited liability company duly organized and validly existing in good standing under the laws of the State of

Delaware and has all necessary power to carry on its business as now being conducted, to carry on its business as contemplated herein, to enter into this Agreement and to observe and perform its terms.

(b)     <u>Authority and Due Execution</u>.  Manager has full power and authority to execute and to deliver this Agreement and all related documents and to carry out the terms hereof and thereof; and such execution and delivery and such performance will not with the passing of time, the giving of notice, or both, result in a default under a breach or violation of (i) Manager's Articles of Organization, or (ii) any law, regulation, court order, injunction or decree of any court, administrative agency or governmental body, or any mortgage, note, bond, agreement, lease, license, permit or other instrument or obligation to which Manager is now a party or by which Manager or any of its assets may be bound or affected.  This Agreement constitutes a valid and binding obligation of Manager, enforceable in accordance with its terms, except to the extent that its enforceability is limited by applicable bankruptcy, reorganization, insolvency, receivership or other laws of general application or equitable principles related to or affecting the enforcement of creditors' rights.

(c)     <u>Litigation</u>.  Except as separately disclosed in writing to Operator prior to the Effective Date, there is no litigation, claim, investigation, challenge or other proceeding pending or, to the knowledge of Manager, threatened against Manager, its properties or business which seeks to enjoin or prohibit it from entering into this Agreement or which if adversely determined would have a material adverse effect on Manager or its financial condition.

**4.3 Indemnification**.  Each Party (the "<u>Indemnifying Party</u>") shall indemnify and hold the other Party and its Affiliates and their owners, members, directors, officers, employees, agents and representatives (collectively, the "<u>Indemnified Party</u>") harmless from and against any and all losses, costs, claims, demands, liabilities, damages, fines and penalties, including but not limited to those relating to investigations, actions, suits, proceedings and hearings and reasonable attorneys' fees and costs (collectively, "<u>Damages</u>") arising out of, related to, or caused by: (a) any act of gross negligence or willful misconduct committed by the Indemnifying Party during this Agreement, and (b) any material breach of, or failure of performance under, this Agreement by the Indemnifying Party; <u>provided</u>, <u>however</u>, that the Indemnifying Party shall have no obligation to indemnify the Indemnified Party to the extent that any Damages are incurred or result out of: (i) any act of gross negligence or willful misconduct by Indemnified Party, or (ii) the willful breach of, or failure of performance under, this Agreement by Indemnified Party.  Notwithstanding the foregoing, Operator expressly covenants not to sue and agrees to indemnify, defend, and hold harmless Manager and its Affiliates from and against any and all claims, costs, damages, expenses (including reasonable attorney's fees), fines, and/or penalties which may be asserted by third parties against Manager or its Affiliates for or with respect to any and all actions taken pursuant to this Agreement and any and all matters relating to the Facility or its operation.  The indemnification obligations of the Parties contained in this Section shall survive and continue after the termination or expiration of this Agreement.

12

## SECTION 5. TERM AND TERMINATION

**5.1  Term.**  The term of this Agreement shall commence on [●][1] (the "Effective Date") and shall continue for a period of one (1) year (the "Initial Term") unless otherwise terminated in accordance with Sections 5.2 or 5.3. After the expiration of the Initial Term, or any subsequent term, this Agreement shall automatically renew for successive one (1) year periods (each, a "Renewal Term"; the Initial Term and all Renewal Terms are collectively referred to as the "Term"), unless either Party notifies the other Party in writing of its intention to terminate this Agreement at the end of the Term and such notice is given at least ninety (90) days prior to the expiration of the Term.

**5.2  Termination Other Than "For Cause."**

**5.2.1.**  During the Term, either Party may terminate this Agreement upon ninety (90) days prior written notice to the other Party.

**5.3  Termination for Cause.**  The Parties may terminate this Agreement at any time for cause, upon delivery of written notice to the other Party, in the event of the following:

(a)  Operator may terminate this Agreement if:

(i)  Manager shall materially default in the performance of a provision hereof and such default shall continue for a period of ninety (90) days after Manager's receipt of written notice from Operator stating the specific default;

(ii)  Manager shall apply for or consent to the appointment of a receiver, trustee or liquidator of Manager or of all or a substantial part of its assets, file a voluntary petition in bankruptcy, admit in writing its inability to pay its debts as they come due, make a general assignment for the benefit of creditors, or file a petition or answer seeking reorganization or an arrangement with creditors or to take advantage of any insolvency law, or if an order, judgment or decree shall be entered by any court of competent jurisdiction, on the application of a creditor, adjudicating Manager bankrupt or insolvent or approving a petition seeking reorganization of Manager or appointment of a receiver, trustee or liquidator of Manager or of all or a substantial part of its assets; or

(iii)  The operating license for the Facility is revoked in its entirety due to Manager's sole fault; provided, however, if the operating license is revoked and thereafter reinstated without this Agreement having

---

[1] **NTD**: To be updated.

been terminated, Manager shall no longer be deemed in default with respect to this provision; or

(iv)     Provided that funds shall have been made available therefor, Manager either fails to correct, within the time permitted by an applicable regulatory body plus thirty (30) days after Manager's receipt of notice thereof, any material conditions of participation capable of such correction by Manager within such period (or obtain waivers for such conditions of participation), or to diligently prepare a plan of correction for any remaining conditions of participation for which the Facility is cited pursuant to any licensure and/or certification survey or diligently implement the plan of correction.

(b)     Manager may terminate this Agreement if:

(i)     Operator shall materially default in the performance of a provision hereof and such default shall continue for (A) a period of ninety (90) days after Operator's receipt of written notice from Manager stating the specific default, or (B) five (5) calendar days if such default involves the failure to pay the Fee, failure to pay amounts due and owing under Section 3 of this Agreement or failure to pay any other amounts due Manager (for which no written notice to Operator is required);

(ii)     Operator shall apply for or consent to the appointment of a receiver, trustee or liquidator of Operator, or of all or a substantial part of its assets, file a voluntary petition in bankruptcy, admit in writing its inability to pay its debts as they come due, make a general assignment for the benefit of creditors, or file a petition or answer seeking reorganization or an arrangement with creditors or to take advantage of any insolvency law, or if an order, judgment or decree shall be entered by any court of competent jurisdiction, on the application of a creditor, adjudicating Operator bankrupt or insolvent or approving a petition seeking reorganization of Operator or appointment of a receiver, trustee or liquidator of Operator or of all or a substantial part of its assets; or

(iii)     Operator fails to provide sufficient funds to Manager, in its discretion, to pay, on a timely basis, all expenses incurred to operate the Facility, including, without limitation, funds necessary to pay those amounts required to be paid in accordance with Sections 2 and 3 of this Agreement.

**5.4 Manager's Obligations after Termination.** Upon expiration of this Agreement, or the termination of Manager's services hereunder, as provided above, Manager shall, upon the payment in full of all monetary obligations due Manager by Operator under this Agreement:

14

(a) deliver to Operator, or such other person or persons designated by Operator, copies of all books and records (except for Manager Materials) of the Facility and all funds, if any, in the possession of Manager pursuant to the terms of this Agreement for or on behalf of Operator;

(b) deliver to the Facility or to such person or persons designated by Operator personal property relating to or used in the operation and maintenance of the Facility, except any personal property which was paid for (and not reimbursed by Operator) and is owned by Manager;

(c) remove, at its cost and expense, all signs that Manager may have placed at the Facility indicating that it is the manager of the Facility and replace and restore any damage resulting therefrom;

(d) within sixty (60) days (or such lesser period if this Agreement is terminated with less than sixty (60) days' notice) prior to the expiration date or termination date of this Agreement, Manager will consult with and advise Operator or such other person or persons regarding the operations and maintenance of the Facility's management transition; and

(e) make itself available at reasonable times at the expense of Operator (at mutually agreed upon rates), for a period of one hundred twenty (120) days after such expiration, or, in the case of termination, during the one hundred eighty (180) days after notification of termination, to consult with and advise Operator or such other person or persons regarding the operation and maintenance of the Facility.

## SECTION 6. CONFIDENTIALITY AND NONDISCLOSURE

**6.1 Confidentiality**. Operator acknowledges and agrees that Operator's compliance with this Section is a material inducement for Manager's execution of and participation in this Agreement. For the purposes of this Agreement, "Confidential Information" means all information of any kind whatsoever provided by or on behalf of Manager to Operator in connection with this Agreement and performance of the services hereunder and, includes without limitation, all data, reports, results, output, technique, trade secret, device, substance, material, drawing, protocol, process, method, formula, schematic, invention, know-how, designs, strategies, ideas, and information developed in, by, through, or as a result of the activities, whether or not patentable or copyrightable, undertaken by Manager in any form whatsoever, including but not limited to, oral, written, graphic, or electronic form, and including information that is not in physical or tangible form that may be recalled by memory alone; provided, however, that "Confidential Information" shall not include any Work for Hire referred to in Section 4.1(e). Confidential Information includes any and all provisions in this Agreement, including all exhibits, schedules, addenda and amendments hereto and thereto. To the extent Confidential Information does not qualify as a trade secret of Manager under applicable law, it will nonetheless be protected under this Agreement. Manager has a strong and legitimate business interest in preserving and protecting its Confidential

15

Information, which is a valuable asset of Manager, and if disclosed, would cause Manager significant and irreparable harm.

**6.2 Excluded Information**. Confidential Information does not include information that: (a) was independently acquired or developed by Operator without violating any obligation under this Agreement and without the use of any Confidential Information; (b) is or becomes generally available to the public through no fault of Operator; or (c) Operator received without restriction from a third party who was lawfully in possession of such information and was not in breach of any contractual or other obligation of confidentiality to Manager or any other person with respect to the disclosure of such information.

**6.3 Nondisclosure**. From the Effective Date of this Agreement, and forever thereafter, Operator will not directly or indirectly disclose, furnish, or make accessible to any third party other than Manager, or copy, take, or use for Operator's own benefit or the benefit of any third party other than Manager, any Confidential Information, except: (a) as expressly authorized by this Agreement; (b) as required by law, government regulation, or court order; or (c) with Manager's prior written consent. If Operator is requested or required to disclose any Confidential Information in connection with any legal or administrative proceeding, Operator will, to the extent not prohibited by law, promptly notify Manager in writing of such request or requirement so that Manager can seek an appropriate protective order or other remedy to prevent or limit disclosure of the Confidential Information. If such protective order or other remedy is not obtained, Operator shall furnish only that portion of the Confidential Information that, in the written opinion of Operator's counsel, is legally required to be disclosed, and Operator will use its best efforts to obtain assurances that confidential treatment will be accorded such information.

**6.4 Permitted Use**. Operator may use the Confidential Information only to the extent required to perform its obligations hereunder. Operator shall treat Manager's Confidential Information with the same degree of care as Operator accords its own Confidential Information, but in no case less than reasonable care.

**6.5 Return or Destruction**. All rights, title, and interest in and to Confidential Information will remain the property of Manager. Upon expiration or termination of this Agreement, and upon reasonable request by Manager, Operator, at Manager's option, shall either return to Manager or destroy (which destruction shall be certified to Manager in writing by Operator): (a) all Confidential Information furnished to Operator or its representatives by or on behalf of Manager; and (b) all tangible media of expression in the possession or control of Operator or its representatives to the extent such tangible media incorporates any of Manager's Confidential Information. Notwithstanding the return or destruction of the Confidential Information, Operator will continue to be bound by its obligations of confidentiality under this Agreement.

**6.6 Survival**. Notwithstanding anything to the contrary in this Agreement, except for Confidential Information constituting "trade secrets" under applicable law (for which confidentiality obligations shall persist until such information is longer a "trade secret"), the confidentiality obligations of this <u>Section 6</u> shall survive termination of this Agreement.

16

## SECTION 7.  MISCELLANEOUS

**7.1 Non-Solicitation of Employees and Business Partners**.  Operator represents, warrants and covenants that for Term of this Agreement and for a period of two (2) years following the date of termination or expiration of this Agreement (the "Non-solicitation Period"), Operator will not, directly or indirectly, (a) solicit, induce, recruit, or encourage any Business Relationships (defined below) of the Manager or its Affiliates to restrict, limit, or terminate their relationship with the Manager; (b) take away such Business Relationships; or (c) attempt to solicit, induce, recruit, encourage, or take away any such Business Relationships, either for the Operator or its Affiliates or for any other person or entity, for the purpose of providing goods and/or services of a business or practice that provides the services provided by Manager hereunder.  Further, Operator will not, directly or indirectly, solicit, hire, recruit, attempt to hire or recruit, or otherwise induce the termination of employment of any employee of Manager or its Affiliates within the twelve (12) months following the termination or expiration of this Agreement; provided, that general advertisements not targeted at such employees shall not be deemed to breach the restrictions set forth in this Section.  For the purposes of this Agreement, "Business Relationships" means customers, vendors, or other business partners of Manager (x) who provided services on behalf of Manager for the benefit of the Facility or Operator during the Term, (y) about whom Operator has learned Confidential Information, trade secrets, or other information that is not available publicly, or (z) who became a customer, vendor, or business partner of Manager or its Affiliates during the twelve (12) months prior to the termination or expiration of this Agreement.

(a)     **Remedies**.  Operator further agrees that Manager is empowered to enforce the restrictive covenants under this Section by obtaining an injunction in court without bond.  The Parties acknowledge and agree that the restrictive covenants under this Section 7.1 are ancillary to an otherwise enforceable Agreement.

**7.2 Limitation on Liability.**  MANAGER AND ITS AFFILIATES SHALL NOT BE LIABLE TO OPERATOR FOR ANY INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES, OR ANY LOSS OF PROFITS, REVENUE, BUSINESS OPPORTUNITY, BUSINESS INFORMATION OR DATA USE.  TO THE EXTENT THAT OPERATOR HAS A VALID CAUSE OF ACTION AGAINST MANAGER OR ITS AFFILIATES ARISING UNDER OR RELATED TO THIS AGREEMENT OR THE FACILITY, OPERATOR SHALL BE LIMITED TO RECOVERING AN AMOUNT EQUAL TO SIX (6) MONTHS OF THE MINIMUM MANAGEMENT FEE PAYABLE TO MANAGER HEREUNDER. THE PARTIES AGREE THAT, EXCEPT AS OTHERWISE PROVIDED HEREIN, MANAGER SHALL HAVE NO RESPONSIBILITY OR LIABILITY WITH RESPECT TO OPERATOR AND OPERATOR'S COMPLIANCE WITH ANY OF THE HEALTH CARE LAWS OR ANY OTHER APPLICABLE LAWS, RULES OR REGULATIONS WHATSOEVER. MANAGER DOES NOT ASSUME ANY LIABILITY FOR ANY DAMAGES ARISING FROM ANY USE OF ANY INSTRUCTION OR INFORMATION PROVIDED BY OPERATOR TO MANAGER UNDER OR IN RELATION TO THIS AGREEMENT.

**7.3 Assignment.**  Manager may assign this Agreement to a wholly or majority owned subsidiary of Manager, or to an Affiliate of Manager, if such assignment may, under applicable law, be effectuated without any further actions by or approvals from regulatory authorities in the

17

state where the Facility is located, including, without limitation, a site inspection at the Facility or the completion of background checks for personnel of the proposed assignee. In addition, Manager may assign this Agreement to a corporation or other entity which is a successor in interest to Manager; provided, that Operator shall first consent thereto in writing, which consent will not be unreasonably withheld if such successor's financial condition, business reputation and experience in the business of managing facilities similar to those owned by Operator are at least as favorable as Manager's.

**7.4  Severability**. If any provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future laws effective during the Term of this Agreement, the provision will be fully severable; this Agreement will be construed and enforced as if the illegal, invalid, or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement. Furthermore, in lieu of each such illegal, invalid, or unenforceable provision, there will be added automatically as a part of this Agreement a provision as similar in terms to the illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.

**7.5  Notices.**  Any notice or other communication by either Party to the other shall be in writing, delivered either personally or by a nationally recognized overnight courier, and addressed as follows:

To Operator:                              c/o SAK Georgia, LLC, Receiver
                                          300 Saunders Rd, Suite 300
                                          Riverwoods, IL  60015
                                          Attention:  Suzanne Koenig
          with a copy to:
                                          [●]

To Manager:                               [●]

or to such other address, and to the attention of such other person or officer, as either Party may designate in writing. Any such properly given notice shall be effective one (1) business day after personal delivery or delivery by nationally recognized overnight courier.

**7.6  Modification and Changes.**  Any changes to the terms of this Agreement will not be effective unless the same shall be set forth in a writing executed by both Parties.

**7.7  Headings.**  The headings contained herein are for the convenience of reference only and are not intended, and shall not be construed, to define, limit or describe the scope or intent of any provision hereof.

**7.8  No Waiver.**  Neither the failure by an aggrieved Party to insist upon strict performance of any covenant, agreement, term or condition hereof or to exercise any remedy consequent upon a breach thereof, nor the acceptance of full or partial performance during the continuance of any

18

breach by the other Party, shall constitute a waiver of any such breach or of such covenant, agreement, term or condition.

**7.9 Further Instruments or Action.** Each Party shall execute and deliver such further instruments and take such other actions as may be reasonably necessary in order effectively to discharge, perform or carry out any of the respective obligations and agreements hereunder.

**7.10 Governing Law.** The validity and construction hereof shall be governed by the laws of the State of Oklahoma, without giving effect to any choice of law or conflicts of law provisions or rule that would cause the laws of any other jurisdiction to be applied. If a dispute arises from or relates to this Agreement or the alleged breach thereof and such dispute cannot be settled through negotiations among the Parties within ninety (90) days, the Parties agree to submit the unresolved issues to binding arbitration in the State of Oklahoma before a panel of three (3) arbitrators experienced in health care matters and in accordance with the rules of the American Arbitration Association; *provided, however,* either Party shall have the option to terminate this Agreement on ninety (90) days written notice to the other Party if (a) the implementation of such decision would, in the opinion of such Party's counsel, cause that Party to violate any applicable rules, laws, regulations or ordinances or (b) as a result of such decision, the fees and reimbursements hereunder are materially increased (in the case of Operator) or decreased (in the case of Manager), or the obligations of Manager are materially changed without a corresponding increase or decrease in fees hereunder. Subject to the foregoing, any arbitration award may be entered in and enforced by any court having jurisdiction thereof, and the Parties consent and commit themselves to the jurisdiction of the courts of the State of Oklahoma for purposes of any enforcement of any arbitration award. Except as may be required by law, neither a Party nor an arbitrator may disclose the existence, content or results of any arbitration hereunder without the prior written consent of both Parties.

**7.11 HIPAA.** If applicable, the Parties agree to enter into a Business Associate Agreement, a copy of which is attached as **Exhibit A**.

**7.12 Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement. This Agreement may also be signed and transmitted by facsimile, pdf, or other electronic means, with such signature to be treated as an original and the document transmitted to be considered to have the same binding effect as an original signature on an original document.

**7.13 Entire Agreement.**   This Agreement sets forth the entire agreement and understanding between the Parties with respect to the subject matter hereof, and supersedes all prior agreements, arrangements, understandings and negotiations relating hereto.

OPERATOR:

**EVANS CARE GROUP, LLC**

By:_____

      Suzanne Koenig, as the authorized
      representative of SAK Georgia, LLC,
      Receiver

**MANAGER:**

[●]

By:_____
Name: [●]
Title: Authorized Representative

**[Signature Page to Management Services Agreement]**

20

SCHEDULE A

FACILITY

| Facility Name | Street Address | Zip | Licensed Beds | In Service | CMS | Legal Name |
|---|---|---|---|---|---|---|
| [●] | [●] | [●] | [●] | | | [●] |

21

# EXHIBIT A

## BUSINESS ASSOCIATE AGREEMENT[2]

### [SEE ATTACHED]

---

[2] NTD:  If applicable.

ACTIVE 699046900v1

## BUSINESS ASSOCIATE AGREEMENT

This Business Associate Agreement ("Agreement") is entered into between Evans Care Group, LLC ("Covered Entity") and [●] ("Business Associate"), with an effective date of [●] ("Effective Date"). This Agreement sets out the responsibilities and obligations of Business Associate as a business associate of Covered Entity under the Health Insurance Portability and Accountability Act ("HIPAA") and the Health Information Technology for Economic and Clinical Health Act ("HITECH Act").

### RECITALS:

A.   Covered Entity and Business Associate are parties to an agreement or arrangement pursuant to which Business Associate provides certain services to Covered Entity ("Services").

B.   In conjunction with Services, Covered Entity may make available to Business Associate Protected Health Information of Individuals, which Business Associate may only Use or Disclose in accordance with this Agreement.

### AGREEMENT:

Business Associate and Covered Entity agree to the terms and conditions of this Agreement in order to comply with the rules on handling of Protected Health Information under the HIPAA Standards for Privacy of Individually Identifiable Health Information, 45 C.F.R. Part 160 and Part 164, Subpart E ("Privacy Rule"), the HIPAA Security Standards, 45 C.F.R. Part 160 and Part 164, Subpart C ("Security Rule"), and the HIPAA Breach Notification Regulations, 45 C.F.R. Part 164, Subpart D ("Breach Notification Rule"), all as amended from time to time.

1.   **DEFINITIONS**

a.   **Terms Defined in Regulation:** Unless otherwise provided in this Agreement, all capitalized terms in this Agreement will have the same meaning as provided under the Privacy Rule, the Security Rule and the Breach Notification Rule.

b.   **Protected Health Information or PHI:** Protected Health Information ("PHI") means PHI that is received from Covered Entity, or created, maintained or transmitted on behalf of Covered Entity, by Business Associate.

2.   **USES AND DISCLOSURES OF PROTECTED HEALTH INFORMATION**

a.   **Performance of Services:** Business Associate will Use or Disclose PHI only for those purposes necessary to perform Services, or as otherwise expressly permitted in this Agreement or required by law, and will not further Use or Disclose such PHI.

b.   **Subcontractors:** Business Associate agrees that, in accordance with § 164.502(e)(1), if Business Associate's Subcontractor creates, receives, maintains or transmits PHI on

23

behalf of Business Associate, Business Associate will enter into an agreement with such Subcontractor that contains substantially the same restrictions and conditions on the Use and Disclosure of PHI as contained in this Agreement.

c.  **Business Associate Management, Administration and Legal Responsibilities:** Business Associate may Use PHI for Business Associate's management and administration, or to carry out Business Associate's legal responsibilities. Business Associate may Disclose PHI to a third party for such purposes only if: (1) the Disclosure is required by law; or (2) Business Associate secures written assurance from the receiving party that the receiving party will: (i) hold the PHI confidentially; (ii) Use or Disclose the PHI only as required by law or for the purposes for which it was Disclosed to the recipient; and (iii) notify the Business Associate of any other Use or Disclosure of PHI.

d.  **Data Aggregation and De-Identification:** Business Associate may Use PHI to perform data aggregation services as permitted by 45 C.F.R. § 164.504(e)(2)(i)(B). Business Associate may also de-identify PHI in accordance with 45 C.F.R. § 164.514.

e.  **Covered Entity Responsibilities:** To the extent Business Associate is to carry out Covered Entity's obligations under the Privacy Rule, Business Associate will comply with the requirements of the Privacy Rule that apply to Covered Entity's compliance with such obligations.

3.   **SAFEGUARDS FOR PROTECTED HEALTH INFORMATION**

a.  **Adequate Safeguards:** Business Associate will implement and maintain appropriate safeguards to prevent any Use or Disclosure of PHI for purposes other than those permitted by this Agreement, including administrative, physical and technical safeguards to protect the confidentiality, integrity, and availability of any electronic protected health information ("ePHI"), if any, that Business Associate creates, receives, maintains, and transmits on behalf of Covered Entity.

b.  **Compliance with HIPAA Security Rule:** Business Associate will comply with the applicable requirements of the HIPAA Security Rule.

4.   **REPORTS OF IMPROPER USE OR DISCLOSURE OF PROTECTED HEALTH INFORMATION, SECURITY INCIDENTS AND BREACHES**

a.  **Use or Disclosure Not Permitted by This Agreement:** Business Associate will report in writing to Covered Entity any Use or Disclosure of PHI for purposes other than those permitted by this Agreement within ten (10) business days of Business Associate's learning of such Use or Disclosure.

b.  **Security Incidents:** Business Associate will report in writing to Covered Entity any Security Incident of which Business Associate becomes aware. Specifically, Business

24

Associate will report to Covered Entity any successful unauthorized access, Use, Disclosure, modification, or destruction of ePHI or interference with system operations in an information system containing ePHI of which Business Associate becomes aware within ten (10) business days of Business Associate learning of such Security Incident. Business Associate also will report the aggregate number of unsuccessful, unauthorized attempts to access, Use, Disclose, modify, or destroy ePHI or interfere with system operations in an information system containing ePHI, of which Business Associate becomes aware, provided that: (i) such reports will be provided only as frequently as the parties mutually agree, but no more than once per month; and (ii) if the definition of "Security Incident" under the Security Standards is amended to remove the requirement for reporting "unsuccessful" attempts to Use, Disclose, modify or destroy ePHI, the portion of this Section 4 addressing the reporting of unsuccessful, unauthorized attempts will no longer apply as of the effective date of such amendment.

c.   **Breaches of Unsecured PHI:**   Business Associate will report in writing to Covered Entity any Breach of Unsecured Protected Health Information, as defined in the Breach Notification Rule, within ten (10) business days of the date Business Associate learns of the incident giving rise to the Breach.   Business Associate will provide such information to Covered Entity as required in the Breach Notification Rule.

5.   **ACCESS TO PROTECTED HEALTH INFORMATION**

a.   **Covered Entity Access:**   Within ten (10) business days of a request by Covered Entity for access to PHI, Business Associate will make requested PHI available to Covered Entity.

b.   **Individual Access:**   If an Individual makes a request for access directly to Business Associate, Business Associate will within ten (10) business days forward such request in writing to Covered Entity.   Covered Entity will be responsible for making all determinations regarding the grant or denial of an Individual's request for PHI and Business Associate will make no such determinations.   Only Covered Entity will release PHI to an Individual pursuant to such a request, unless Covered Entity directs Business Associate to do so.

6.   **AMENDMENT OF PROTECTED HEALTH INFORMATION**

a.   **Covered Entity Request:**   Within ten (10) business days of receiving a request from Covered Entity to amend an Individual's PHI, Business Associate will provide such PHI to Covered Entity for amendment.   Alternatively, if Covered Entity's request includes specific instructions on how to amend the PHI, Business Associate will incorporate such amendment into the PHI it holds in a Designated Record Set within ten (10) business days of receipt of the Covered Entity request.

b.   **Individual Request:**   If an Individual makes a request for amendment directly to Business Associate, Business Associate will within ten (10) business days forward such

25

request in writing to Covered Entity. Covered Entity will be responsible for making all determinations regarding amendments to PHI and Business Associate will make no such determinations unless Covered Entity directs Business Associate to do so.

7. **ACCOUNTING OF DISCLOSURES OF PROTECTED HEALTH INFORMATION**

   a. **Disclosure Records**: Business Associate will keep a record of any Disclosure of PHI that Business Associate makes, if Covered Entity would be required to provide an accounting to Individuals of such Disclosures under 45 C.F.R. § 164.528. Business Associate will maintain its record of such Disclosures for six (6) years from the date of the Disclosure.

   b. **Data Regarding Disclosures**: For each Disclosure for which it is required to keep a record under paragraph 7(a), Business Associate will record and maintain the following information: (1) the date of Disclosure; (2) the name of the entity or person who received the PHI and the address of such entity or person, if known; (3) a description of the PHI Disclosed; and (4) a brief statement of the purpose of the Disclosure.

   c. **Provision to Covered Entity**: Within ten (10) business days of receiving a notice from Covered Entity, Business Associate will provide to Covered Entity its records of Disclosures.

   d. **Request by Individual:** If an Individual requests an accounting of Disclosures directly from Business Associate, Business Associate will forward the request and its record of Disclosures to Covered Entity within ten (10) business days of Business Associate's receipt of the Individual's request. Covered Entity will be responsible for preparing and delivering the accounting to the Individual. Business Associate will not provide an accounting of its Disclosures directly to any Individual, unless directed by Covered Entity to do so.

8. **ACCESS TO BOOKS AND RECORDS**

   Business Associate will make its internal practices, books and records on the Use and Disclosure of PHI available to the Secretary of the Department of Health and Human Services to the extent required for determining compliance with the Privacy Rule, the Security Rule, or the Breach Notification Rule. No attorney-client, accountant-client or other legal privilege will be deemed waived by Business Associate or Covered Entity as a result of this Section.

9. **TERMINATION**

   Covered Entity may terminate this Agreement upon material breach of this Agreement. Covered Entity will provide Business Associate with written notice of the breach of this Agreement and afford Business Associate the opportunity to cure the breach to the satisfaction of Covered Entity within thirty (30) days of the date of such notice. If Business

26

Associate fails to timely cure the breach, as determined by Covered Entity in its sole discretion, Covered Entity may terminate this Agreement.

**10.    RETURN OR DESTRUCTION OF PROTECTED HEALTH INFORMATION**

    **a.   Return or Destruction of PHI**:   Within thirty (30) days of termination of this Agreement, Business Associate will return to Covered Entity all PHI that Business Associate or its Subcontractors maintain in any form or format. Alternatively, Business Associate may, upon Covered Entity's consent, destroy all such PHI and provide written documentation of such destruction.

    **b.   Retention of PHI if Return or Destruction is Infeasible**:   If Business Associate believes that returning or destroying PHI at the termination of this Agreement is infeasible, it will provide written notice to Covered Entity within thirty (30) days of the effective date of termination of this Agreement.   Such notice will set forth the circumstances that Business Associate believes makes the return or destruction of PHI infeasible and the measures that Business Associate will take for assuring the continued confidentiality and security of the PHI. Business Associate will extend all protections, limitations and restrictions of this Agreement to Business Associate's Use or Disclosure of PHI retained after termination of this Agreement and will limit further Uses or Disclosures to those purposes that make the return or destruction of the PHI infeasible.

**11.    MISCELLANEOUS**

    **a.   COMPLIANCE WITH LAWS:**   The parties are required to comply with federal and state laws.  If this Agreement must be amended to secure such compliance, the parties will meet in good faith to agree upon such amendments.  If the parties cannot agree upon such amendments, then either party may terminate this Agreement upon thirty (30) days' written notice to the other party.

    **b.   CONSTRUCTION OF TERMS:**   The terms of this Agreement will be construed in light of any applicable interpretation or guidance on the Privacy Rule, the Security Rule or the Breach Notification Rule issued by HHS.

    **c.   NO THIRD PARTY BENEFICIARIES:**   Nothing in this Agreement will confer upon any person other than the parties and their respective successors or assigns, any rights, remedies, obligations, or liabilities whatsoever.

    **d.   NOTICES:**   All notices required under the Agreement will be given in writing and will be delivered by (1) personal service, (2) first class mail, or (3) messenger or courier. All notices shall be addressed and delivered to the contact designated in the signature block, or other address provided by the party from time to time in writing to the other party.  Notices given by mail will be deemed for all purposes to have been given forty-

27

eight hours after deposit with the United States Postal Service. Notices delivered by any other authorized means will be deemed to have been given upon actual delivery.

e. **ENTIRE AGREEMENT:** This Agreement constitutes the entire agreement between the parties with regard to the Privacy Rule, the Security Rule and the Breach Notification Rule, there are no understandings or agreements relating to this Agreement that are not fully expressed in this Agreement and no change, waiver or discharge of obligations arising under this Agreement will be valid unless in writing and executed by the party against whom such change, waiver or discharge is sought to be enforced.

f. **WRITTEN AGREEMENT:** This Agreement will be considered an attachment to the underlying agreement or arrangement and is incorporated as though fully set forth within the underlying agreement or arrangement. This Agreement will govern in the event of conflict or inconsistency with any provision of the underlying agreement or arrangement.

g. **COUNTERPARTS AND SIGNATURE:** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and when taken together shall constitute one agreement. Facsimile and electronic signatures shall be deemed to be original signatures for all purposes of this Agreement.

28

**h.  CHOICE OF LAW:**  The validity, construction and effect of this Agreement will be governed by the laws of the State of Oklahoma, without giving effect to that state's conflict of laws rules.  Any Dispute will be resolved in a forum located in the State of Oklahoma.

**EVANS CARE GROUP, LLC**                    **[●]**

By: _____          By: _____

Print Name: _____          Print Name: _____

Title: _____          Title: _____

Date: _____          Date: _____

**Contacts for Notices under this Agreement:**

Print Name: _____          Print Name: _____

Title: _____          Title: _____

Address: _____          Address: _____

_____          _____

Phone: _____          Phone: _____

29