**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION**

| | | |
|---|---|---|
| BOKF, N.A, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CV 124-088 |
| | * | |
| EVANS CARE GROUP, LLC and | * | |
| SUNSHINE RETIREMENT LIVING, | * | |
| LLC, | * | |
| | * | |
| Defendants. | * | |
| | * | |

**O R D E R**

Before the Court are Defendants' motion to discharge the receiver, terminate the receivership, and enter judgment in favor of Plaintiff (Doc. 34); motion for oral argument[1] (Doc. 41); and motion to lift stay (Doc. 47). Upon due consideration, the Court **DENIES** the motions.

**I. BACKGROUND**

On October 31, 2019, Plaintiff BOKF, N.A., d/b/a Bank of Oklahoma executed a loan agreement and issued a loan to four borrowers, including Defendant Evans Care Group LLC ("Evans"), to

---

[1] On September 30, 2025, Defendants moved for oral argument on their motion to discharge the receiver, and on October 7, 2025, the Receiver and Plaintiff each responded in opposition (Docs. 43, 44). On October 14, 2025, Defendants replied (Doc. 46). Because the motion was thoroughly briefed and a status conference was held, the Court finds no need to conduct oral arguments on the matter. Thus, Defendants' motion for oral argument (Doc. 41) is **DENIED.**

refinance debt for four healthcare facilities including Marshall Pines Alzheimer's Special Care Center (the "Facility"). (Doc. 1, at 2.) The remaining three debtors paid down the debt owed to Plaintiff, and Defendant Evans remains the sole borrower. (Doc. 34, at 2.) Defendant Evans is the owner of the Facility, which secures the remaining debt to Plaintiff as a first-priority lien. (Id.) At the time the lawsuit was filed, Defendant Sunshine Retirement Living, LLC ("SRL") was operating the Facility.[2] (Id.)

On June 5, 2024, Plaintiff filed a complaint for breach of contract and money judgment, appointment of receiver, and injunctive relief against Defendants. (Doc. 1, at 8-16.) On June 24, 2024, the Court entered an agreed order (the "Agreed Order") appointing receiver (the "Receiver"), granting certain injunctive relief, and approving Receiver financing. (Doc. 22, at 1.) Further, the Facility's security agreement states that a receiver shall be appointed "as a matter of strict right, without notice and without regard to the sufficiency or value of any security for the loan, . . . to take possession of and to operate the Mortgaged Property and to collect and apply any revenue." (Id. at 7.) From the Agreed Order, the Receiver was "appointed expressly to preserve, protect, and maintain the value of the [Facility]." (Id. at 27.) The Receiver is authorized to oversee the Facility and

---

[2] SRL no longer manages the Facility. (Doc. 22, at 5.)

2

its management and to "have complete possession, management, custody and exclusive control" of the Facility.  (Id. at 10.) However, the Receiver does not have the responsibility of preparing or filing any tax return for the Defendants.  (Id. at 29.) Regarding the sale of the Facility, the Receiver may take all steps necessary to market it for sale, including engaging a broker, and may enter into a transaction for sale so long as any agreement or transaction is approved by Plaintiff.  (Id. at 16.)

On July 21, 2024, Plaintiff filed a motion to stay answer, discovery, and pretrial deadlines pending resolution of the disposition of the receivership estate.  (Doc. 25.)  On July 31, 2024, the Court granted the stay and directed the Parties "to move the Court to lift the stay when the receiver completes the sale, or other Court-approved disposal, of the assets."  (Doc. 30, at 1.)

As required by the Agreed Order, the Receiver filed various status reports on September 24, 2024 (Doc. 32); December 19, 2024 (Doc. 33); March 21, 2025 (Doc. 39); September 29, 2025 (Doc. 40); October 1, 2025 (Doc. 42); and December 22, 2025 (Doc. 49).  The first report stated that the Receiver retained a broker to begin the process of putting the Facility up for sale.  (Doc. 32, at 5.) The second report presented a 13.6% increase of the net operating income from $111,525 between June 1, 2024 to August 31, 2024 to $126,758 between September 1, 2024 to November 30, 2024.  (Doc.

3

33, at 2; Doc. 34, at 5.) The second report also noted a successful transition of operations to a new manager, a new financial and medical recordkeeping system, control of cash management accounts, an updated marketing plan, improved human resources functions, and external repairs to the facility. (Doc. 33, at 2-5; Doc. 34, at 5.) The second report further stated the Receiver "retained a broker to assess the value of the Facility and, if appropriate, market the Facility for a possible sale." (Doc. 33, at 5.) The third report showed a net operating income of $71,051 from December 1, 2024 to January 31, 2025.[3] (Doc. 39, at 2.) The third report stated the Receiver had received several letters of intent regarding the sale of the Facility and was negotiating with potential buyers. (Id. at 5.) The Receiver was to choose the highest and best offer and report it to the Court for approval. (Id.)

Due to an administrative error, the Receiver failed to submit the fourth report on June 24, 2025 as intended and instead submitted it on September 29, 2025. (Doc. 43, at 2.) On October 1, 2025, the Receiver filed an "Amended Fourth and Fifth Report." (Doc. 42.) The Amended Fourth and Fifth Report stated net operating income was $98,211 from February 1, 2025 to May 31, 2025

---

[3] The third report stated financial reporting for the month of February 2024 was not closed at the time of the report, so the report reflects two months of financial reporting from December 1, 2024 through January 31, 2025 instead of three months. (Doc. 39, at 2.) The Receiver provided February 2025 financial reporting in the fourth report. (Doc. 42, at 2.)

4

and $125,554 from June 1, 2025 to August 31, 2025. (Id. at 2.) The Amended Fourth and Fifth Report also stated the Receiver negotiated an asset purchase agreement with a proposed buyer, but ultimately "the parties decided not to pursue the transaction due to broader macroeconomic concerns." (Id. at 6.) The sixth report presented a net operating income of $161,529 from September 1, 2025 to November 30, 2025. (Doc. 49, at 2.) The sixth report also stated that "[a]fter prior sale efforts were unsuccessful due to the status of the Facility and then-current market factors," the Receiver has stabilized the Facility and generated "positive cashflow and a stable market." (Id. at 6.) "The Receiver expects to recommence marketing the Facility for sale in early 2026, subject to market conditions and the Facility's financial results." (Id.)

On January 28, 2025, Defendants filed a motion to discharge receiver, terminate receivership, and entry of judgment in favor of Plaintiff. (Doc. 34.) On February 11, 2025, the Receiver responded in opposition. (Doc. 35.) On February 11, 2025, Plaintiff also responded. (Doc. 36.) On February 25, 2025, Defendants replied. (Doc. 38.) On November 4, 2025, Defendants filed a motion to lift the Court's July 31, 2024 Order staying all proceedings in this case, including discovery and deadlines. (Doc. 47.) On November 17, 2025, Plaintiff responded. (Doc. 48.) On

5

February 23, 2026, the Court held a status conference with the Parties.  The motions are ripe for the Court's review.

## II. DISCUSSION

"The decision on whether to terminate a receivership turns on the facts and circumstances of each case. . . .  Generally, a receivership should be dismissed when the reason for the receivership ceases to exist."  65 Am. Jur. 2d Receivers § 94 (2025).  In considering when the reason for the receivership ceases to exist, the Court considers the factors that a court may analyze when deciding whether to appoint a receiver. Truist Bank, Inc. v. Francis, No. 1:20-CV-4109, 2025 WL 2622079, at *1 (N.D. Ga. Apr. 23, 2025) (citing Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc., 999 F.2d 314, 316 (8th Cir. 1993)).

> These factors include (1) whether fraudulent activity has or will occur, (2) the validity of the claim, (3) the danger that property will be lost or diminished in value, (4) inadequacy of legal remedies, (5) availability of less severe equitable remedy, and (6) the probability that a receiver may do more harm than good.

Id.; see also Canada Life Assurance Co. v. LaPeter, 563 F.3d 837, 844 (9th Cir. 2009). Defendants argue the Receiver should be discharged because the Receiver has "assume[d] management and operation" of the Facility, yet Defendants must maintain the Facility's existing permits and licenses.  (Doc. 34, at 7.) Defendants claim they are subjected to "the risk associated with having a third-party over whom Defendants have no control or

6

authority operating under those permits and licenses." (Id.) Further, Defendants claim they are "responsible and at risk with respect to the [Facility] without any control or input into the manner, methods or operating aspects of the facility." (Id. at 8.) Defendants also argue their obligation of preparing and filing ongoing tax returns for the Facility justifies terminating the Receiver because the Facility "has been divested other than in name" from them. (Id. at 7-8.) Defendants claim they have also been prejudiced by the "inaction and delay of the Receiver in failing to pursue the sale of the [F]acility." (Id. at 8.)

Defendants point out that Plaintiff could take control of the Facility, terminate the receivership, or foreclose on the Facility and "sell it to a third-party or bid and take ownership for itself" at any time. (Id. at 7.) Defendants also propose transferring the Facility "via a deed in lieu of foreclosure to expedite the process and lessen the costs and expenses." (Id. at 10.) Defendants claim the Facility operations are fully self-supporting, all financial matters are controlled, all resident health information has been transferred to the new system, and the technology and support services including the website and social media are operative and independently running. (Id. at 11.) Defendants thus argue Plaintiff could acquire legal title by

7

"foreclosure, a deed in lieu of foreclosure, or transfer to an entity controlled by [Plaintiff]."[4]   (Id.)

The Receiver argues the Receivership remains appropriate under the factors because the property would be in danger of being lost or diminished in value, the balance of harms between the party seeking the receiver and those opposing it, and the probability that a receiver may do more harm than good or cause "irreparable injury to plaintiff's interest in the property."  (Doc. 35, at 4); Canada Life Assur. Co., 563 F.3d at 844.  The Receiver states it has stabilized the operations of the Facility, but the receivership should remain in place until the Facility is sold to receive the full value for Plaintiff.  (Doc. 35, at 5.)  The Receiver also recounts the events leading to the Receiver's appointment where the Facility "was jeopardized by the dire financial conditions of [Defendant] Evans, who was unable to pay for insurance to protect and preserve the Facility" and "defaulted on its loan obligation." (Id. at 4-5 (internal quotations omitted).)

The Receiver urges the Court not to terminate the receivership because it has been successful in stabilizing the business, improving the quality of care, and has preserved the value of the

---

[4] Defendants state Plaintiff previously agreed with Defendants to transfer the Facility to an entity owned by Plaintiff, so Plaintiff could operate the Facility as long as it wanted and then either sell or foreclose when desired. (Doc. 34, at 10-11.)  Plaintiff decided not to pursue this agreement because of previous concerns with transitioning services, which have been resolved based on the Receiver's second report.  (Id. at 11.)  Thus, Defendants and Plaintiff previously prepared transfer documents in full, which, Defendants state, can still be used for an immediate transfer.  (Id.)

8

Facility for a sale. (Id. at 6.) The Receiver states its experienced team "expertly assess[es] patient care and efficiently and accurately perform[s] the role of the Receiver" using "their clinical knowledge of and substantial experience in the healthcare industry." (Id. at 5.) Further, the Receiver argues it should remain in place until the Facility is sold to avoid undermining the purpose of the receivership. (Id. at 7.) The Receiver states that partial completion of the intended outcome – "stabilizing the facility and operating it for a profit" – does not resolve the reason for the receivership. (Id.) Instead, the Receiver states, all "preserved value in the Facility . . . w[ould] be lost if termination occurs before the sale," and a forced foreclosure would result in irreparable harm to the residents and Plaintiff. (Id.) The Receiver claims if Plaintiff foreclosed on the Facility, Plaintiff would have to set up new processes for payroll, arrange new insurance coverge for the Facility, enter into new contracts with service providers, and arrange new agreements with utility companies. (Id. at 7-8.) Finally, the Receiver states it is "progress[ing] toward the sale of the Facility" with the manager and broker. (Doc. 43, at 3.)

Moreover, Plaintiff argues termination is not appropriate because the primary objective of the receivership – "[m]aximizing the [v]alue of the [r]eceivership [e]state [t]hrough a [s]ale [p]rocess" – has not been accomplished. (Doc. 36, at 4.)

9

Plaintiff first points out that there has been no change in circumstances warranting discharge of the Receiver. (Id.) Second, Plaintiff points out the sale process is still ongoing, and the "Receiver should not be discharged until after the sale closes and the Receiver files its final report." (Id. at 5.) Third, Plaintiff argues discharging the Receiver after transitioning to a new manager, implementing new policies and procedures to ensure proper care to residents, carrying out repairs, and replacing vendor contracts would only diminish the value of the receivership assets and jeopardize the future of the Facility. (Id. at 6.) As to Defendants' argument that Plaintiff may foreclose on the Facility at any time, Plaintiff states foreclosure would "put[] the future and safety of the Facility and its residents at risk by subjecting the Facility and its patients to another multi-month and costly transition and foreclosure process, the outcome of which cannot be predicted." (Id. at 7.) Regarding the sale of the Facility to a buyer, Plaintiff states the Receiver is "reengage[ing] the existing pool of interested buyers and expand[ing] outreach to new prospects." (Doc. 44, at 3.) Plaintiff emphasizes the "objective of the receivership is to maximize the value; not to expedite a sale under terms that are misaligned with market realities." (Id.)

Defendants' reply affirms their position that the Receiver should be discharged. (Doc. 38.) Defendants argue that "the

10

stabilization and preservation of the [F]acility can be easily maintained and enhanced without prolonging the receivership and involvement of the Court." (Id. at 3.)  Further, Defendants argue terminating the receivership does not require "a change in the operator of the facility," and the Receiver "can continue its work at the [F]acility uninterrupted upon termination of the receivership." (Id. at 4.)  Thus, Defendants urge the Court to discharge the Receiver because the title to the Facility is "easily and quickly transferable" and operations could be continued "seamlessly." (Id. at 5.)

Here, the Court finds termination of the receivership is not justified at this time based on the performance of the Receiver and the Facility's newfound financial stability.  The Court finds the purpose of the receivership has not been satisfied because no sale has taken place, and any alleged "inaction and delay" of a sale has not caused sufficient prejudice to Defendants as to justify termination.  The above factors also weigh in favor of maintaining the receivership because there are no signs of fraudulent activity, risk of loss of property or value, or a less severe equitable remedy.  See Truist Bank, 2025 WL 2622079, at *1 (citation omitted).  Any concerns Defendants raise regarding filing tax returns and maintaining the licenses and permits for the Facility are outweighed by the Receiver's management and control that have led to significant financial improvements and

11

Facility growth. Further, the Receiver indicated during the status conference on February 23, 2026 that its broker is continuing to market the Facility and anticipates a sale this year. Accordingly, Defendants have failed to show a justifiable basis for discharging the Receiver and terminating the receivership. Therefore, Defendants' motion to discharge the Receiver (Doc. 34) is **DENIED**, and because the receivership remains in place, the Receiver has not completed the sale of the Facility, and there has been no resolution of the disposition of the assets by the Receiver, Defendants' motion to lift stay (Doc. 47) is also **DENIED**.

## III. CONCLUSION

Based on the foregoing, Defendants' motion to discharge the receiver, terminate the receivership, and enter judgment in favor of Plaintiff (Doc. 34); motion for oral argument (Doc. 41); and motion to lift stay (Doc. 47) are **DENIED**.

**ORDER ENTERED** at Augusta, Georgia, this 24th day of February, 2026.

_____
HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA

12